```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5-25-11
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
DELIO ALOISIO MATTOS SANTOS FILHO,   :
                                     :
                  Plaintiff,         :
                                     :    No. 10 Civ. 7508 (JFK)
     -against-                       :    **Opinion and Order**
                                     :
SAFRA NATIONAL BANK OF NEW YORK,     :
                                     :
                  Defendant.         :
------------------------------------X

APPEARANCES:

   For the Plaintiff
   Philip Byler, Esq.
   NESENOFF & MILTENBERG, LLP

   For the Defendant
   Barry Fischer, Esq.
   Eric Waldman, Esq.
   THE BARRY FISCHER LAW FIRM LLC

**JOHN F. KEENAN, United States District Judge:**

Before the Court is Defendant Safra National Bank of New York's ("SNB" or "Defendant") motion to compel arbitration or, alternatively, to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion to compel arbitration is granted; the Court need not reach the issues presented in the motion to dismiss.

## I.   Background

### A.   Filho's Investment Account at SNB

Plaintiff Delio Aloisio Mattos Santos Filho ("Filho" or "Plaintiff") is a citizen of Brazil residing in Rio de Janeiro.

1

(Compl. ¶ 2).  Filho alleges that he was holding Euros in a Portuguese bank account for the purchase of real property in Brazil, but he did not know when the real estate transaction would occur.  (Id. ¶ 8).  As a result, Filho wanted the money to be readily available to him.  (Id.)  On July 1, 2002, a representative of SNB visited Filho in Rio de Janeiro and offered him SNB's private banking services.  (Id. ¶ 7).  Filho agreed to open an account at SNB.  He claims that, due to his limited English skills,[1] he signed blank account application documents which the SNB representative actually filled out for him.  (Id. ¶ 9).  On the signature page of the account application, there is a list of special services that account holders may request.  (Declaration of Peter Javier ("Javier Decl."), Ex. 3).  There are check marks next to Hold Mail, Designated Name Account, and Custody Account services, but Filho alleges that he did not request that SNB hold his mail or provide a designated name account.  (Compl. ¶ 13).  Filho's account was officially opened on August 1, 2002 under the designated name "Riding."  (Id. ¶ 11).  Later that month, Filho transferred €160,000 into his new SNB account.  (Id. ¶ 18).

---

[1] The Court notes that Plaintiff submitted an affidavit in opposition to this motion that is written in English and is not a translation.  The affidavit makes no mention of any language barrier or inability to read, write, or understand SNB's English-language banking documents.  Moreover, the complaint quotes from emails between Filho and his SNB account representative, all of which are in English.

2

SNB's International Banking Terms and Conditions ("IBTC"), as they existed in 2002, provides that:

> Through this Agreement you can establish an investment services account.  An Investment Account allows you to purchase and sell securities and other investments based on your own investment decisions and instructions.
>     . . . .
> You understand and agree that all financial instruments and securities purchased by the Bank for your Investment Account will be selected by you, without recommendation or advice by the Bank and are in no way the obligation of or guaranteed by the Bank and that you alone bear any risk of loss in connection with any financial instruments or securities purchased or sold at your direction for your Investment Account.

(Javier Decl., Ex. 1, ¶ 31).

The gravamen of Plaintiff's complaint is that SNB representatives invested his money in inappropriately risky securities without his prior approval.  Specifically, Filho alleges that between February 5, 2007 and August 4, 2008, SNB engaged in twelve different unauthorized investment transactions with money held in his account.  (Compl. ¶¶ 24-45).  Since SNB was holding his mail, Filho purportedly had no knowledge of this account activity.

On the basis of the allegedly unauthorized transactions, Filho brings claims for:  (1) breach of contract; (2) breach of fiduciary duty; (3) negligence; (4) gross negligence; (5) negligent supervision; (6) conversion; (7) securities fraud

under Rule 10b-5; (8) violation of the Investment Advisors Act of 1940; and (9) common law fraud.

### B. SNB Changes the Terms and Conditions to Include an Arbitration Clause

As described above, SNB imposed certain terms and conditions on its accounts. Approximately one inch above the signature line on SNB's account application is an "Acknowledgement" section which states that: "By signing below, you [the applicant] acknowledge that you: have received, understand and agree to the <u>International Banking Terms and Conditions for Accounts</u> [IBTC] provided with this Application with respect to accounts or services you have requested herein . . . [and] understand that the Terms and Conditions are subject to change." (Javier Decl., Ex. 3). Despite this acknowledgement, Filho contends that he did not receive the terms and conditions when he applied for his SNB account. (Compl. ¶ 14).

The IBTC in place in 2002 contemplated litigation in the event of a legal dispute:

> You [account holder] irrevocably agree: (a) to submit to the non-exclusive jurisdiction of any state or federal court sitting in the district in which the office at which any account is maintained [is] located in any action or proceeding arising out of or relating to any of your accounts with the Bank, (b) that all claims in respect of such action or proceeding may be heard and determined in such courts, and (c) [to] waive trial by jury in all cases. The Bank also waives trial by jury in all cases.

4

(Javier Decl., Ex. 1, ¶ 27).

However, both the account application and the IBTC contain provisions notifying customers that SNB may change its terms and conditions at any time. (Javier Decl., Ex. 1, ¶ 28 ("The Bank reserves the right to change these Terms and Conditions as well as its schedule of charges . . . . Any such change in the Terms and Conditions or new charges will only become effective 10 days following delivery of a notice to you at your last address as shown on the Bank records.")). The IBTC specifically addresses the issue of notice of changes for customers whose mail is held:

> If you request and we agree that statements, items and other account information not be mailed, we will hold all mail for your account until you either pick it up in person at the office where your account is located or give us other instructions. All correspondence retained by us, including notices having legal consequences or affecting these Terms and Conditions, shall be deemed to have been delivered to you on the date which appears on the correspondence or on the mailing list held with us and shall be effective notwithstanding your lack of knowledge of the contents of such correspondence.

(Javier Decl., Ex. 1, ¶ 12).

In January 2005, before any of the allegedly unauthorized investments occurred, SNB replaced the IBTC with new General Terms and Conditions ("GTC"). The GTC changed the dispute resolution clause of the IBTC such that:

> If any dispute, controversy or claim ("Claim") arising out of or relating to any business relationship between you and the Bank, including, without limitation, any Claim with regard to these General

5

> Terms and Conditions and any account or transaction you have with the Bank[,] cannot be settled through direct discussions between you and the Bank, such Claim shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. . . .  All arbitration hereunder shall be conducted in the State of New York in English.  Any decision or award rendered by the arbitrator(s) shall be final and binding on you and the Bank, and a judgment may be entered thereon in any court of competent jurisdiction.  You and the Bank acknowledge and agree that:  (i) each hereby consents, for itself, to the jurisdiction of the State of New York for all purposes relative to an arbitration and the entry to judgment; (ii) each hereby waives, for itself, pursuant thereto, the right to seek remedies in court, including, without limitation, a trial by jury and punitive damages; (iii) arbitration is final and binding; (iv) pre-arbitration discovery is generally more limited than and different from court proceedings; (v) the arbitrator(s) award is not required to include factual findings or legal reasoning and any party's right to appeal or seek modification of rulings by the arbitrator(s) is strictly limited; and (vi) the arbitrator(s) may include an individual(s) who were or are affiliated with the banking or securities industry.

(Javier Decl., Ex. 2, ¶ 22a).

SNB now moves to compel Filho to arbitrate his claims pursuant to the arbitration clause in the GTC.  In the alternative, SNB moves to dismiss each of Filho's nine claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### II.  Discussion

#### A.  Motion to Compel Arbitration

Under the Federal Arbitration Act ("FAA"), an arbitration provision in a contract involving interstate commerce, such as the one at issue, "shall be valid, irrevocable, and enforceable,

save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section reflects "a congressional declaration of a liberal federal policy favoring arbitration agreements. . . ." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). Accordingly, the district court may stay any lawsuit involving an issue that is arbitrable under a valid arbitration agreement. 9 U.S.C. § 3. Furthermore, a party who is "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration" can move in federal district court to compel the parties to arbitrate. 9 U.S.C. § 4. "The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." Id. Therefore,

> a court asked to stay proceedings pending arbitration in a case covered by the [FAA] has essentially four tasks: first, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then determine whether to stay the balance of the proceedings pending arbitration.

Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 844 (2d Cir. 1987) (internal citations omitted).

7

### 1. Agreement to Arbitrate

"Because an agreement to arbitrate is a creature of contract . . . the ultimate question of whether the parties agreed to arbitrate is determined by state law." Bell v. Cendant Corp., 293 F.3d 563, 566 (2d Cir. 2002); see Specht v. Netscape Commc'ns Corp., 306 F.3d 17, 27 (2d Cir. 2002). The parties agree that New York law applies. The determination of whether the parties entered into a binding contract to arbitrate turns on whether Defendant's January 2005 unilateral modification of its Terms and Conditions, which added the arbitration clause, is enforceable against Plaintiff.

New York courts have not explicitly addressed the issue at bar. However, other courts have confronted identical legal issues in the context of credit card holder agreements. The facts of the credit card cases are by and large the same as this case: sometime after a plaintiff opened a credit card account with a bank, the bank decided to add an arbitration clause to its cardholder agreement pursuant to a "change of terms" clause in the original cardholder agreement. When a dispute subsequently arose, the bank moved to compel arbitration pursuant to the new arbitration clause. In determining whether the parties agreed to arbitrate, those courts looked to the meaning and scope of a contract's "change of terms" clause to

determine whether the defendant was authorized to add the arbitration clause.

In Stone v. Golden Wexler & Sarnese, P.C., 341 F. Supp. 2d 189 (E.D.N.Y. 2004), the "change of terms" provision at issue provided that the bank "may amend or change any part of your Agreement, including the periodic rates and other charges, or add or remove requirements at any time." Id. at 191. The Court, applying Virginia law, found this clause to be ambiguous because it could feasibly allow any new term to be added or only changes to pre-existing terms. Id. at 197. The Court held that "the terms discussed in the change-in-terms clause must supply the universe of terms which could be altered or affected pursuant to the clause." Id. at 198. The Stone "change of terms" clause provided for changes to any part of the customer agreement, but the original agreement did not include any provision for dispute resolution; therefore, the arbitration clause was not a change contemplated by the "change of terms" clause and was not properly added. Id. "To hold otherwise would permit the Bank to add terms to the Customer Agreement without limitation as to the substance or nature of such new terms. There is nothing to suggest that plaintiff intended to give such unlimited power to the Bank, or that the law would sanction such a grant." Id.

Similarly, in <u>Follman v. World Financial Network National Bank</u>, 721 F. Supp. 2d 158 (E.D.N.Y. 2010), the original cardholder agreement contained a "change of terms" clause authorizing the bank to "add, change or delete the terms of this Agreement (including, but not limited to, Annual Percentage Rate and fees), at any time with or without notice." <u>Id.</u> at 159-60. Although the "change of terms" clause was broadly worded to allow additions to the agreement, the Court, applying Ohio law, found that "[e]ven though the instant change-of-terms provision contains language that does not limit itself to authorizing changes to only some, but not other, terms, an added term must still be within the substantive scope of the change-of-terms provision – that is, it must be contemplated by the original agreement." <u>Id.</u> at 165. Since the original agreement did not reference any dispute resolution procedures, the Court found that "the arbitration provision falls outside the scope of the universe of terms contemplated by the original agreement, [so] the change-of-terms provision did not authorize defendant to add it." <u>Id.</u> at 166. Several other courts have followed this approach. <u>See, e.g.</u>, <u>Perry v. FleetBoston Financial Corp.</u>, No. 04 Civ. 507, 2004 WL 1508518, at *4 (E.D. Pa. July 6, 2004) (applying Rhode Island law to interpretation of ambiguous "change of terms" clause and holding that "although Plaintiffs agreed to the Change in Terms provision, Defendant's authority

10

is not unbridled. The Change in Terms provision is reasonably limited to terms previously contemplated by the original agreement, so long as cardholders do not accept the unilateral change by continuing to use their cards"); <u>Sears Roebuck & Co. v. Avery</u>, 593 S.E.2d 424, 434 (N.C. Ct. App. 2004) (applying Arizona law to interpretation of ambiguous "change of terms" clause and holding that "[b]ecause the arbitration clause was a wholly new term that did not fall within the universe of subjects included in the original agreement, Sears did not have authority under its 'Change of Terms' provision to condition continued use of its credit card on acceptance of the arbitration clause"); <u>Badie v. Bank of America</u>, 79 Cal. Rptr. 2d 273, 289 (Cal. Ct. App. 1998) (applying California law to ambiguous "change of terms" clause and noting that "the parties did not intend that the change of terms provision should permit the Bank to add new contract terms that differ <u>in kind</u> from the terms and conditions included in the original agreements").

Although none of these cases apply New York law, two cases suggest that New York would follow their approach to contract interpretation. In <u>In re American Express Merchants Litigation</u>, No. 03 Civ. 9592, 2006 WL 662341 (S.D.N.Y. Mar. 16, 2006), <u>rev'd on other grounds</u>, 554 F.3d 300 (2d Cir. 2009), <u>vacated</u>, 130 S. Ct. 2401 (2010), the court applied <u>Stone</u> and <u>Perry</u> when interpreting the scope of a "change of terms" provision governed

11

by New York law.  The court held that "[s]ince the pre-1999 merchant contracts contained provisions concerning the resolution of disputes, including sections pertaining to various legal proceedings such as bankruptcy and lawsuits in which the merchant would indemnify American Express and pay their attorneys' fees, the original contract sufficiently alerted plaintiffs that the defendants might later amend the terms of the contract with respect to the resolution of disputes between the parties."  Id.  The Court of Appeals found the appeal of this particular ruling to be moot in light of other issues.  Despite its complicated appellate history, the district court's holding that the pre-existing merchants were subject to the new arbitration clause appears to be intact.

    Second, in Krupp v. Franklin Savings Bank in City of New York, 5 N.Y.S.2d 365 (N.Y. App. Div. 1938), the plaintiff opened a savings account at defendant bank and received a pass-book for the account.  "At the time he opened the account he signed a signature card which stated that he agreed to the by-laws of the Bank and any amendments or additions that might thereafter be made thereto."  Id. at 366.  The original by-laws simply provided that a customer must produce an original pass-book in order to make a withdrawal.  Id. at 367.  The bank later changed its by-laws to require customers who lost their pass-books to post a bond in order to get a new pass-book.  Id.  Plaintiff

lost his pass-book but challenged the new bond requirement.  The Court held that "[i]n view of the express agreement between the parties to abide by amended by-laws, and the fact that the present amendments were adopted pursuant to the authority granted by statute, we hold that plaintiff should be required to comply with the amended by-laws and furnish a bond of indemnity."  Id. at 368.

This Court agrees with the legal framework set forth in Stone, Follman, and Badie, etc., but applies New York's substantive contract law to the interpretation of the scope of the IBTC's "change of terms" clause.  Under New York law, contracts are construed in accordance with the parties' intent as evidenced by their written terms.  Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002).  An unambiguous contract term is enforced as written.  Id.  In deciding whether an agreement is ambiguous, courts "should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed.  Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby."  Kass v. Kass, 696 N.E.2d 174, 180-81 (N.Y. 1998) (citing Atwater & Co. v. Panama R.R. Co., 159 N.E. 418, 419 (N.Y. 1927)).  "Where an ambiguity exists in a standard-form contract supplied by one of the parties, the

13

well-established <u>contra proferentem</u> principle requires that the ambiguity be construed against that party." <u>Westchester Resco Co., LP v. New England Reinsurance Corp.</u>, 818 F.2d 2, 3 (2d Cir. 1987) (per curiam) (applying New York law).

Turning to the contract at hand, the Court must determine whether the IBTC authorized Defendant to modify the terms and conditions for its accounts to require account holders to arbitrate disputes. The IBTC includes a broadly worded "change of terms" clause in which Defendant reserves the right "to change these Terms and Conditions." Javier Decl., Ex. 1, ¶ 28. By its own terms, the contract's "change of terms" clause only allows Defendant to impose changes to <u>these</u> Terms and Conditions, meaning those pre-existing provisions in the IBTC. Neither party suggests any ambiguity in the "change of terms" clause. Thus, in accordance with the contract's directive, the Court looks to the 2002 IBTC in its entirety to determine what terms Plaintiff could reasonably expect to be subject to change. In the vast majority of the above-cited cases, courts denied defendants' attempts to force plaintiffs into arbitration because the original contracts did not include any reference to dispute resolution procedures such that plaintiffs would understand that dispute resolution procedures could be subject to change by way of the "change of terms" clause. Unlike, for example, the contract in <u>Avery</u>, in which dispute resolution was

14

"a term not even hinted at in the original agreement," 593 S.E.2d at 434, the 2002 IBTC included a detailed "Consent to Jurisdiction; Waivers" clause whereby account holders, among other things, (1) consented to jurisdiction of particular state or federal courts, (2) waived forum non conveniens and venue objections, (3) waived the right to pursue punitive damages, (4) consented to service of process by mail, and (5) waived the right to a jury trial. Javier Decl., Ex. 1, ¶ 27. Therefore, the "Consent to Jurisdiction; Waivers" language is part of the universe of terms subject to the "change of terms" clause in the original agreement; as it specifies both the forum and procedures for resolving legal disputes, the IBTC's "change of terms" clause put Plaintiff on notice that these forum and dispute resolution provisions were subject to change. Plaintiff agreed to let Defendant make such a change by his signature on the account application whereby he acknowledged that he received, understood, and agreed to the IBTC. As such, Defendant had contractual authority to replace the 2002 "Consent to Jurisdiction; Waivers" clause with the 2005 arbitration clause.

Plaintiff makes two challenges to the enforceability of the arbitration clause. First, he argues that the 2005 change was a contract modification requiring separate consideration under New York law. See N.Y. Gen. Oblig. Law § 5-1103 ("An agreement,

15

promise or undertaking to change or modify, or to discharge in whole or in part, any contract . . . shall not be invalid because of the absence of consideration, provided that the agreement, promise or undertaking changing, modifying, or discharging such contract . . . shall be in writing and signed by the party against whom it is sought to enforce the change, modification or discharge, or by his agent."). This argument completely ignores the "change of terms" clause in the IBTC. Indeed, as the Court has found that the contractual change was properly implemented through an agreed-upon "change of terms" provision, it is not a contract modification as contemplated by New York's General Obligation Law at all. See, e.g., Lamb v. Emhart Corp., 47 F.3d 551, 560 (2d Cir. 1995) ("The original contract (the Agreements) which the parties bargained for, agreed upon, and were bound by, was one which allowed the representatives of one party, the Emhart Board of Directors, to change the terms of the contract in accordance with ascertainable standards.  The original agreements, in short, contemplated the Amendments.  Thus the Amendments did not require either party to do something further than or different from that which he [was] already bound to do, and were not a material modification requiring additional consideration." (internal quotation omitted)) (applying Connecticut law); Badie, 79 Cal. Rptr. 2d at 280 ("Whether the Bank's customers can be

16

said to have agreed to allow the Bank to add the ADR clause to those agreements simply by sending them notice of the change depends, as a threshold matter, on the meaning and scope of the change of terms provision itself.  Implicit in the Bank's interpretation of that provision is the assumption that adding the ADR clause is not really a modification at all because, by entering the original account agreements, the customers agreed ahead of time to be bound by any term the Bank might choose to impose in the future.").

Second, Plaintiff contends that he never agreed to the arbitration provision because he did not receive or read either the 2002 IBTC or the 2005 GTC.  Directly above Plaintiff's signature on the account application is an acknowledgement that he received, understood, and agreed to the IBTC.  Javier Decl., Ex. 3.  Plaintiff is bound by that affirmation despite his current protestations to the contrary.  See Gillman v. Chase Manhattan Bank, N.A., 534 N.E.2d 824, 828-29 (N.Y. 1988) ("Frohlich signed the application form immediately below the bold-face legend stating: 'The Security Agreement on the reverse hereof is hereby accepted and made applicable to this Application and the Credit.'  He states that he did not read the front of the form or the legend but gives no explanation for his failure to do so.  Under the general rule, [Frohlich's company] would be conclusively bound by the security agreement

17

irrespective of Frohlich's testimony that he did not read it and was unaware of its terms."); Tsadilas v. Providian Nat'l Bank, 786 N.Y.S.2d 478, 480 (N.Y. App. Div. 2004) ("Plaintiff is bound by the arbitration provision even if she did not read it."); Brower v. Gateway 2000, Inc., 676 N.Y.S.2d 569, 573 (N.Y. App. Div. 1998) ("That a consumer does not read the agreement or thereafter claims he or she failed to understand or appreciate some term therein does not invalidate the contract any more than such claim would undo a contract formed under other circumstances."). Plaintiff's signature confirms that he agreed to the "change of terms" clause in the IBTC.

Moreover, by signing the account application Plaintiff effectively agreed to waive his right to actual notice of the new GTC by virtue of the hold mail provision in the IBTC. Javier Decl., Ex. 1, ¶ 12 ("All correspondence retained by us, including notices having legal consequences or affecting these Terms and Conditions, shall be deemed to have been delivered to you on the date which appears on the correspondence or on the mailing list held with us and shall be effective notwithstanding your lack of knowledge of the contents of such correspondence."). Plaintiff does not allege that Defendant failed to prepare or attempt to deliver mail items. Instead, Plaintiff argues that he never requested that Defendant hold his mail. However, Plaintiff submitted an affidavit in opposition

18

to Defendant's motion in which he admits that on December 4, 2002, he contacted his SNB representative to find out why he had not received any account statements.  Affidavit of Delio Aloisio Mattos Santos Filho ¶ 6.  Even if he did not request the hold mail service, Plaintiff had the opportunity to cancel it long before the account terms and conditions changed in 2005, or before the first allegedly unauthorized transaction occurred in early 2007.  Yet, not once during any of those time periods or during the seven years that his account was open did Plaintiff make any effort to receive his mail.  Plaintiff's own failure to take any action to assure his actual notice of the changed terms cannot invalidate his prior agreement to allow Defendant to change the contract.

The "change of clause" terms in the IBTC authorized Defendant to replace the "Consent to Jurisdiction; Waivers" clause with an arbitration clause.  By virtue of his agreement to the "change of terms" clause, Plaintiff is bound by the GTC's arbitration clause.  Thus, there is a valid agreement to arbitrate.

## 2. Scope of Arbitration Agreement

"[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  Moses H. Cone Mem'l Hosp., 460 U.S. at 24-25.  The GTC's broadly worded arbitration clause covers "any dispute, controversy or claim

19

("Claim") arising out of or relating to any business relationship between you and the Bank, including, without limitation, any Claim with regard to these General Terms and Conditions and any account or transaction you have with the Bank." Javier Decl., Ex. 2, ¶ 22a. As the arbitration clause covers "any dispute arising out of or relating to [the parties'] business relationship" as opposed to merely disputes involving the contract, and as neither party has suggested otherwise, all claims are subject to arbitration. This includes both of Plaintiff's federal statutory claims. See Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 238 (1987) (Exchange Act section 10(b) claims are arbitrable).

### III.     Conclusion

Defendant's motion to compel arbitration is granted. As the arbitration clause encompasses all of Plaintiff's claims, this case is dismissed without prejudice in favor of arbitration proceedings. See Milgrim v. Backroads, Inc., 142 F. Supp. 2d 471, 476 (S.D.N.Y. 2001). The Court need not reach Defendant's alternative motion to dismiss the complaint.

**SO ORDERED.**

Dated:   New York, New York
         May 25, 2011

*/s/ John F. Keenan*
John F. Keenan
United States District Judge

20