UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
DELIO ALOISIO MATTOS SANTOS FILHO,  |
                                       |         10 Civ. 7508 (JFK)
           Plaintiff,  |
                                       |
     - against -  |
                                       |
SAFRA NATIONAL BANK OF NEW YORK,  |
                                       |
          Defendant.  |
------------------------------------------------------------------x

## PLAINTIFF'S POST-TRIAL PROPOSED
## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

**NESENOFF & MILTENBERG, LLP**
Of Counsel: Philip A. Byler, Esq./Andrew T. Miltenberg, Esq.
**Attorneys for Plaintiff Delio Alosisio Mattos Santos Filho**
**363 Seventh Avenue - Fifth Floor**
**New York, New York 10001**
**212.736.4500**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ............................................................................ 1

PROPOSED FINDINGS OF FACT ....................................................................... 1

I.     The Parties ............................................................................................. 2

II.    Plaintiff Delio Filho's Summary Financial History ........................................ 2

III.   The Opening Of The Account At The Defendant Bank
      With Defendant Bank Officer Mr. Naslausky ............................................... 3

IV.   The Account Under Defendant Bank Officer Mr. Nasluasky ........................... 7

V.    The Account Under Defendant Bank Officer Ms. Ferreira ............................. 7

      A.    Ms. Ferreira's Communications With Plaintiff Delio
             Filho In Fourth Quarter 2006 and January 2007 ..................................... 8

      B.    The Unauthorized Structured Note Transactions ..................................... 10

      C.    Ms. Ferreira's October 2008 Statements To Plaintiff
             Delio Filho .................................................................................. 16

      D.    John Geelan's Expert Testimony: The Very High Risk
             Nature of the Structured Notes Unsuitable For and Not
             Properly Disclosed To Plaintiff Delio Filho ............................................ 17

VI.   The Account Under Defendant Bank Officer Mr. Amorim .............................. 20

VII.  The Losses In The Account At Defendant Bank ........................................... 22

PROPOSED CONCLUSIONS OF LAW ................................................................. 23

I.     Plaintiff Delio Filho's Rule 10b-5 Violation Claim ...................................... 24

      A.    Defendant Bank Was Subject To The Antifraud
             Provisions Of The Securities Exchange Act of 1934 ................................ 24

B. The Preponderance Of The Evidence Established
The Elements Of The 10b-5 Action ....................................................................28

 (1) The Structured Notes Were Securities Under
The Securities Exchange Act of 1934 ...........................................................28

 (2) The Preponderance Of The Evidence Established The Material
Misstatement Or Omission Element Of The 10b-5 Action ........................29

 (3) The Preponderance Of The Evidence Established
The *Scienter* Element Of The 10b-5 Action ................................................30

 (4) The Preponderance Of The Evidence Established
The Transaction Causation Element Of The 10b-5 Action ........................32

 (5) The Preponderance Of The Evidence Established
The Economic Loss Element Of The 10b-5 Action ...................................33

 (6) The Preponderance Of The Evidence Established
The Loss Causation Element Of The 10b-5 Action ...................................34

C. The *Delshah Group LLC v. Atit Javeri, et al.* Case .................................................35

II. Plaintiff Delio Filho's Breach of Contract Claim ..............................................37

 A. The Elements of Breach of Contract Were Satisfied ................................38

  (1) Existence Of A Contract ..................................................................38

  (2) Performance By The Party Seeking Recovery (Plaintiff
Delio Filho)....................................................................................39

  (3) Non-Performance By The Other Party (Defendant Bank)............................39

  (4) Damages Attributable To The Breach Of Contract.......................................40

 B. Defendant Bank's Attempt To Invoke Fine Print Contractual
Language To Absolve Itself Of Liability Is Unavailing ...........................................41

III. Plaintiff Delio Filho's Breach of Fiduciary Duty Claim......................................43

 A. Under The Law and Given The Facts of This Case, The
Defendant Bank Owed A Fiduciary Duty To Plaintiff Delio Filho...........................43

B.    The Defendant Bank Breached Its Fiduciary Duties To Plaintiff Delio ...................45

C.    Damages Attributable To The Breach Of Fiduciary Duty .......................................45

IV.   Plaintiff Delio Filho's Common Law Fraud Claim.........................................................46

V.    Punitive Damages For The 10b-5, Breach of Fiduciary
      Duty and Common Law Fraud Claims ...............................................................................47

CONCLUSION .........................................................................................................................47

## TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) .............................................................31

*ADT Operations, Inc. v. Chase Manhattan Bank, N.A.*, 173 Misc.2d 959,
    662 N.Y.S.2d 190 (Sup.Ct. N.Y. Co. 1997) .......................................................43

*Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40 (2d Cir. 1991) ........................................................46

*Banque Arabe Et Internationale D'Investissement v. Maryland National*,
    57 F.3d 146 (2d Cir. 1995) ...........................................................................46

*Basic Incorporated v. Levinson*, 485 U.S. 224 (1988) ...................................................................29

*Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 F. App'x 20 (2d Cir. 2011) ......................37

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).......................................................24

*Brass v. American Film Technologies, Inc.*, 987 F.2d 142 (2d Cir. 1993) ......................................46

*Brennan v. Bally Total Fitness*, 153 F.Supp.2d 408 (S.D.N.Y. 2001) .....................................42-43

*Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 173 Ariz. 148,
    840 P.2d 1013 (Ariz. S.Ct.  1992)..........................................................41, 42

*Castellano v. Young & Rubicam, Inc.*, 257 F.2d 171 (2d Cir. 2001) .............................................32

*Central Bank of Denver N.A. v. First Interstate Bank of Denver N.A.*, 511 U.S. 164 (1994) .......25

*Chill v. General Electric Company*, 101 F.3d 263 (2d Cir. 1996) .................................................31

*Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383,
    682 P.2d 388 (Ariz. S.Ct. 1984) .................................................................42

*Delshah Group LLC v. Atit Javeri, et al.*, 2013 WL 2322488 (S.D.N.Y. May 28, 2013) ...........28,
    35-37

*Desiderio v. National Ass'n of Sec. Dealers*, 191 F.3d 19 (2d Cir. 1999),
    *cert. denied*, 531 U.S. 1069 (2001) ............................................................42

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) ...........................................24, 28, 33

_ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,_
    553 F.3d 187 (2d Cir. 2009) ........................................................................32

_Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.,_ 343 F.3d 189 (2d Cir. 2003) .....32, 34

_Ernst & Ernst v. Hochfelder,_ 425 U.S. 185 (1976) ...................................................30, 31

_First Invs. Corp. v. Liberty Mut. Ins. Co.,_ 152 F.3d 162 (2d Cir.1998) ...........................38

_Follman v. World Financial Network National Bank_, 721 F.Supp.2d 158 (E.D.N.Y. 2010) .........42

_Frydman & Company, et al. v. Credit Suisse First Boston Corp.,_ 272 A.D.2d 236,
    708 N.Y.S.2d 77 (1st Dep't 2000) ............................................................44

_Gaidon v. Guardian Life Insurance_, 94 N.Y.2d 330, 725 N.E.2d 598,
    704 N.Y.S.2d 177 (1999) ........................................................................46

_Ganino v. Citizens Utilities Co.,_ 228 F.3d 154, 162 (2d Cir. 2000) ...............................29

_Godfrey v. Eastman Kodak Co.,_ 1991 WL 64463 (S.D.N.Y. 1991) .......................................41

_Graham v. Scissor-Tail, Inc.,_ 28 Cal.3d 807, 171 Cal. Rptr. 604, 623 P.2d 165 (1981).................42

_Herman & MacLean v. Huddleston,_, 459 U.S. 375 (1983) ...............................................24

_In re Flag Telecomn Holdings, Ltd. Securities Litigation_, 574 F.3d 29 (2d Cir. 2009) ..........28, 33

_Janus Capital Group, Inc. v. First Derivative Traders,_ __ U.S. __, 131 S.Ct. 2296 (2011) .........25

_Lentell v. Merrill Lynch & Co., Inc.,_ 396 F.3d 161, 172 (2005) .....................................34

_Levine v. Seilon_, 439 F.2d 328 (2d Cir. 1971) ......................................................34

_Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.,_ 967 F.2d 742 (2d Cir. 1992)...................32

_Manufacturers Hanover Trust Co. v. Yanakas_, 7 F.3d 310, 318 (2d Cir. 1993) ...........................44

_Marks v. New York University,_ 61 F.Supp.2d 81 (S.D.N.Y.1999) .......................................38

_Matrixx Initiatives Inc. v. Siracusano_, __ U.S. __, 131 S.Ct. 1309 (2011) .................28, 29, 30-31

_Ottmann v. Hanger Orthopedic Group_, 353 F.3d 338 (4th Cir. 2003) ...................................31

*Overton v. Todman & Co.*, 478 F.3d 479 (2d Cir. 2007) ..............................................25

*P. Chimento, Inc. v. Banco Popular de Puerto Rico*, 208 A.D.2d 385,
    617 N.Y.S.2d 1757 (1st Dep't 1994)...........................................................................44

*RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349 (2d Cir. 2005) ..............38

*Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 46 (2d Cir. 1978) ...........................................31

*Rush v. Oppenheimer & Co.*, 638 F.Supp. 872 (S.D.N.Y. 1996) ....................................................43

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996) ..................................................................................31

*Scott v. Dime Savings Bank of New York*, 886 F.Supp. 1073 (S.D.N.Y. 1995) .............................44

*Sears Roebuck and Co. v. Avery*, 593 S.E.2d 424 (N.C. Ct. App. 2004) ..............................41, 42

*S.E.C. v. W.J. Howey*, 328 U.S. 293 (1946) ................................................................................34

*Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124 (2d Cir. 1994) ...................................................31

*South Cherry St., LLC v. Hennessey Group LLC*, 573 F.3d 98 (2d Cir. 2009) ..............................31

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) .......... 28, 33

*Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87 (2d Cir. 2001) ......................32

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308 (2007) .................................................30

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) ........................................................29

*Weiner v. Lazard Freres & Co.*, 241 A.D.2d 114, 672 N.Y.S.2d 8 (1st Dep't 1998).....................44

*Wheeler v. St. Joseph Hosp.*, 63 Cal.App.3d 345, 133 Cal. Rptr. 775 (1976) ..............................41

*Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 801-802 (2d Cir.),
    *cert. denied*, 414 U.S. 908 (1973) .......................................................................33-34

**Statutes & Rules**

Securities Exchange Act of 1934, § 3(a)(10), 15 U.S.C. § 78c(a)(10) ......................................28-29

Securities Exchange Act of 1934, § 3(a)(4)(A),15 U.S.C. § 78c(4)(B)....................................25, 26

Securities Exchange Act of 1934, § 3(a)(4)(B),15 U.S.C. § 78c(4)(B)....................................25, 26

Securities Exchange Act of 1934, § 3(a)(4)(D), 15 U.S.C. § 78c(4)(D) ........................................45

Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b) ....................................1, 24-37, 47-48

Securities Exchange Act of 1934, § 28(a), 15 U.S.C. § 78bb(a) .................................................33-34

Securities Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5........................1, 24-37, 47-48

12 C.F.R. § 9.2(e) ......................................................................................................................45

12 C.F.R. § 9.2(i) .......................................................................................................................45

Regulation D, 17 C.F.R. §§ 230.500-230.508 ..........................................................................27

Regulation R, 17 C.F.R. §§ 247.700-247.781 ......................................................................25-26

17 C.F.R. § 247.771 ...............................................................................................................26-27

Regulation S, 17 C.F.R. §§ 230.601-230.904 ......................................................................26-27

17 C.F.R. § 230.903 ...................................................................................................................27

17 C.F.R. § 230.903(a)...............................................................................................................27

17 C.F.R. § 230.903(b)...............................................................................................................27

## Other Authorities

E.A. Farnsworth, _Contracts_, § 12.1, p. 730 (4th ed. 2004)..............................................................40

E.A. Farnsworth, _Contracts_, § 4.26, pp. 285-294 (4th ed. 2004) ...................................................41

Second Restatement of Contracts § 211 and comments ............................................................41-42

Second Restatement of Contracts § 344 .....................................................................................40

8 Samuel Williston, _A Treatise on the Law of Contracts_ § 18.9, at 54 (4th 1998) ....................42

## PRELIMINARY STATEMENT

Plaintiff Delio Alosio Mattos Santos Filho ("Plaintiff Delio Filho") respectfully submits the following Proposed Findings of Fact and Conclusions of Law to show to the Court that Plaintiff Delio Filho has at trial established, by the requisite standard of proof: (i) the private cause of action under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; (ii) breach of contract; (ii) breach of fiduciary duty; and (iv) common law fraud.

These causes of action arise from the actions of Defendant Safra National Bank of New York ("Defendant Bank") investing Plainitff Delio Filho's account monies in high risk Structured Notes that were wholly unsuitable for an average person such as Plaintiff Delio Filho with modest means and that was done by Defendant Bank without authorization, without even disclosure in most instances and with wholly inadequate disclosure when disclosure was made.  Plaintiff Delio Filho's account monies were, quite differently, to have been handled conservatively so that the account monies would be available for use in buying real estate in Brazil.  In a case where a bank, without authorization always and without the knowledge of the customer most of the time, invested that average customer's monies in highly risky Structured Notes suitable only for sophisticated, wealthy investors receiving full disclosure, Defendant Bank's rationalizations for escaping liability need to meet firm judicial rejection on the legal grounds that are clearly applicable here.  Judicial relief for the financial damages to Plaintiff Delio Filho is in order.

The trial record consists of: the parties' Stipulations of Fact contained in the Joint Pre-Trial Order (Stip. Fact"); the trial testimony of Plaintiff Delio Filho, John Geelan (expert) and Peter Javier (for Defendant Safra Bank of New York); and documentary evidence in the received Joint Exhibits ("JX"), Plaintiff's Exhibits ("PX") and Defendant's Exhibits ("DX").

## PROPOSED FINDINGS OF FACTS

### I.     The Parties.

1.   Plaintiff Delio Alosio Mattos Santos Filho ("Plaintiff Delio Filho") is a Brazilian citizen residing at Travessa do Paço No. 23 – 904, Rio de Janeiro – RJ 20010-170, Brazil.  In 1978, Plaintiff Delio Filho graduated from law school in Rio de Janeiro.  Plaintiff Delio Filho has practiced civil law ever since.  (Stip. Fact 1.)  Plaintiff Delio Filho worked for one to two years in 1992 and 1993 for a Bank providing advice about agreements that were in default, but that work did not involve going to court and it was the only time he worked for a Bank.  (Plaintiff Delio Filho, Trial Tr. 29-30, 68-69.)

2.   Defendant Safra National Bank of New York ("Defendant Bank") is a privately-owned nationally chartered bank with its principal place of business located at 546 Fifth Avenue, New York, New York.  (Stip. Fact 2.)

### II.    Plaintiff Delio Filho's Summary Financial History.

3.   Plaintiff Delio Filho in the 1980's had one experience with a security, which was a mutual fund, and after an economic change, Plaintiff Delio Filho lost everything he put in that mutual fund and had a bad memory of losing everything.  In the years 1989 to 2002, Delio did not own and had no experience in common stock, preferred stock, bonds, municipal bonds or any other kind of security.  In the years 1990 to 2010, Plaintiff Delio Filho received only professional fees as income; he had no rental income; and he had no annual income exceeding $100,000 except for the one time with the160,000 Euros earned in Portugal.  In the years 1990 to 2010, except for the monies earned in Portugal, Plaintiff Delio Filho did not have assets exceeding $100,000.  (Plaintiff Delio Filho, Trial Tr. 28-33, 91.)

4.  Defendant Bank's attempt to treat Plaintiff Delio Filho as a sophisticated Bank lawyer and businessman (Defendant Bank Opening, Trial Tr. 26) is unsupportable given the record of Plaintiff Delio Filho's career and financial history.  Quite differently, Plaintiff Delio Filho has been a solo civil practitioner with modest personal finances, and he has not practiced law in the area of securities and is unsophisticated with respect to securities.  (Plaintiff Delio Filho, Trial Tr. 28-33, 56, 64.)

**III.   The Opening Of The Account At The Defendant
Bank With Defendant Bank Officer Mr. Naslausky.**

5.  On or about July 1, 2002, Plaintiff Delio Filho had a meeting with a Defendant Bank officer, one Mr. Carlos Eduardo Naslausky ("Mr. Naslausky"), at the office of Plaintiff Delio Filho's father located in Rio de Janeiro, Brazil.  At that meeting and in all communications between Plainitff Delio Filho and Mr. Naslausky, Portuguese was the language spoken or written.  The father of Plaintiff Delio Filho was not a client of Defendant Bank.  Mr. Naslausky was present in the office of Plaintiff Delio Filho's father when Plaintiff Delio Filho arrived.  (Stip. Fact 3; Plaintiff Delio Filho, Trial Tr. 33-34, 53, 71-72.)

6.  According to Plaintiff Delio Filho, Mr. Naslausky offered an account to Plaintiff Delio Filho so that Plaintiff Delio Filho would not need to open an account in Portugal for the fees earned there.  Plaintiff Delio agreed to open an account at Defendant Bank, and into that account, Plaintiff Delio Filho intended to put the legal fees earned from an inheritance matter in Portugal.  To Mr. Naslausky, Plaintiff Delio Filho was "very clear" about wanting no risk at all, "100 per cent secure," because the money put into the Defendant Bank was meant to purchase a real estate property in Brazil for his family. In addition, the money should be available for Plaintiff Delio Filho once the real estate became available for purchase.  (Stip Fact 3; Plaintiff Delio Filho, Trial Tr. 34-36, 45, 89-

90.)  Mr. Naslausky did not testify.  (*See* Pre-Trial Order Section D & Trial Tr..)  Peter Javier for Defendant Bank was not privy to what Mr. Naslausky did in opening the account in 2002. (Peter Javier, Trial Tr. 226-227.)

      7.    JX 1 contains the following account opening documents: International Application/Customer Profile, Know Your Customer Profile, Investment Profile, Special Services, Account Opening Declaration, International Banking Facility, Acknowledgment, International Banking Terms and Conditions, and Investment Agreement, which were previously marked at the deposition of Plaintiff Delio as part of D-1, Bates stamp SNB-SF 00001 through SNB-SF 00018, SNB-SF 00021, and SNB-SF 00024 through SNB-SF 00029.  (JX 1,  SNB-SF 00001 to SNB-SF 00018, SNB-SF 00021, and SNB-SF 00024 to SNB-SF 00029.)

      8.  At a second meeting with Mr. Naslausky in the office of Plaintiff Delio Filho's father in Rio de Janeiro, Plaintiff Delio Filho signed JX 1 on page SNB-SF 00007, acknowledging his agreement to the "International Banking Terms and Conditions."  Plaintiff Delio Filho did not, however, do any of the entries on JX 1, pages SNB-SF 00001-00008, did not date the acknowledgment and did not read the acknowledgment because, he testified, with such a banking contract, the customer had to accept the bank's terms.  (Stip. Fact 5; JX 1; Trial Tr. 27; Plaintiff Delio Filho, Trial Tr. 37-38, 77, 81-83.)  Peter Javier for Defendant Bank testified that the general policy of Defendant Bank was not to allow a customer to opt out of any provision in the standardized contract.  (Peter Javier, Trial Tr. 225-226.)

      9.  Page SNB-SF00005 of JX 1 shows that the referral to Plaintiff Delio Filho as a customer is by Mr. Naslausky, that the source of the monies for the account is "professional earnings" and that the opening deposit was of 160,000 Euros.  Page SNB-SF 00005 of JX 1 also shows that in the next

12 months, more funds would be deposited, and Plaintiff Delio would put through the account: $3,000 in the demand deposit account; $100,000 in a time deposit account; and $200,000 in investments. Plaintiff Delio Filho, however, did not intend to deposit any more funds beyond the 160,000 Euros. (JX 1, SNB-SF 00005; Plaintiff Delio Filho, Trial Tr. 149-150.)

    10.   Page SNB-SF 00006 of JX 1 is marked to authorize investment in general accounts, mutual funds, money market, U.S. equities and time deposits. Emerging market debt and derivative instruments are not authorized. Plaintiff Delio Filho did not, however, intend to own stock. (JX 1, SNB-SF 00006; Plaintiff Delio Filho, Trial Tr. 149-150.)

    11.   On pages SNB-SF 00006 and SNB-SF 00007 of JX 1, the special services of "Hold Mail," "Designated Name Account" and "Custody Account" are checked as applicable. Plaintiff Delio Filho did not, however, check the "Hold Mail" box, and Mr. Naslausky did not discuss with Plaintiff Delio Filho what "Hold Mail" meant. (JX 1, SNB-SF 00006; Plaintiff Delio Filho, Trial Tr. 37-38.) Page SNB-SF 00008 of JX 1 shows the signature of Mr. Naslausky attesting that he met with Plaintiff Delio on July 1, 2002 to open the account and the signature of other Defendant Bank officers approving the opening of the account. (JX 1.) Page SNB-SF 000021 is an account terms page opening a checking account showing the signature of Plaintiff Delio Filho and his account name as "Riding." (JX 1, SNB-SF 00021.)

    12.   Mr. Naslausky never showed, to Plaintiff Delio Filho at the July 1 meeting, the "International Banking Terms and Conditions," and Mr. Nasluasky never went through the terms of the "International Banking Terms and Conditions" with Plaintiff Delio Filho. The "International Banking Terms and Conditions" is in English and small print. (Plaintiff Delio Filho, Trial Tr. 39-40; JX 1, SNB-SF 00008-00016.)

13. As noted above, Plaintiff Delio signed JX 1 on page SNB-SF 00007 acknowledging agreement to the "International Banking Terms and Conditions." (JX 1, SNB-SF 00007, SNB-SF 00009 through SNB-SF 00018; Plaintiff Delio Filho, Trial Tr. 39-40, 77.) The "International Banking Terms and Conditions" provides, among other things, in section 31 that "all financial instruments and securities purchased by the Bank for your Investment Account will be selected by you, without recommendation or advice by the Bank." (JX 1, SNB-SF 00016.) The "International Banking Terms and Conditions," also provides, among other things, in section 12 that "Notwithstanding the foregoing, you understand that United States law requires that certain materials in connection with securities you hold in an Account be forwarded to you regardless of any hold mail arrangement." (JX 1, SNB-SF 00012; Peter Javier, Trial Tr. 224-225.)

14. An investment agreement, which was and is in English and small print, was marked at the deposition of Plaintiff Delio as part of D-1, Bates stamp SNB-SF 00023 through SNB-SF 00029, was received in evidence as part of PX 1 (Bates stamp SNB-SF 00001 through SNB-SF 00018, SNB-SF 00021 and SNB-SF 00023-29). (Stip. Fact 5; JX 1; Trial Tr. 27.)

15. The account opening documents were approved by the Defendant Bank's Compliance Department on August 1, 2002, at which time Plaintiff Delio Filho formally became a client of the Defendant Bank, which opened an account for Plaintiff Delio Filho under the designated name "Riding." (Stip Fact 6; JX 1; JX 2.)

16. The monthly account statements for Plaintiff Delio's account at Defendant Bank from June 2003 through June 2010, were received in evidence as JX 3. (Stip. Fact 9; JX 3.) Plaintiff Delio Filho did not have these monthly statements in 2007 and 2008 in his physical possession because they were sent to "Hold Mail"; he received the monthly statements in his physical

possession  in 2009 only after he requested and received the "Hold Mail" file, but then sent the "Hold Mail" to his attorney. (Plaintiff Delio Filho, Trial Tr. 50-52, 106.)  It did not concern Plaintiff Delio Filho that he was not receiving monthly account statements because there were no movements in the account.  (Plaintiff Delio Filho, Trial Tr. 79.)

IV.    **The Account Under Defendant Bank Officer Mr. Naslausky.**

17.  In late 2002, Plaintiff Delio Filho put 160,000 Euros into the account.  Plaintif Delio Filho's written authorization to convert the 160,000 Euros into U.S. dollars on a 1 to 1 basis was written in Portuguese and was received in evidence as JX 2.  The written authorization to convert the 160,000 Euros into U.S. dollars was requested by Mr. Naslausky and was directed to Mr. Naslausky.  The written authorization to convert the 160,000 Euros into U.S. dollars was dated December 4, 2002, and had hand written on it "Riding."  JX 2, the written authorization to convert the 160,000 Euros into U.S. dollars, showed that Plaintiff Delio Filho knew how to give a written authorization.  (JX 2, SNB-SF 00031; Plaintiff Delio Filho, Trial Tr. 40-42; Stip. Fact 7.)

18.  After this conversion of 160,000 Euros into U.S. dollars was effected, Mr. Naslausky put Plaintiff Delio Filho's account monies into a jumbo CD that paid 0.6% and matured in September 2006, but Mr. Naslausky never contacted Plaintiff Delio Filho thereafter. Plaintiff Delio Filho did not object to the monies being put into the CD.  (JX 2, SNB-SF 00031; Plaintiff Delio Filho, Trial Tr. 40-42, 87; Stip. Fact 8.)

V.    **The Account Under Defendant Bank Officer Ms. Ferreira.**

19.  In October or November 2006, Plaintiff Delio Filho called Defendant Bank because he had not been in contact for a period of time and he wanted to find out if everything was OK.  He had not called Defendant Bank before then because he knew the amount of money in the account was

approximately $150,000 and it was not invested in securities.  When in October or November 2006, Plaintiff Delio Filho called the Defendant Bank, he learned that Mr. Naslausky was no longer at the Bank and that Plaintiff Delio's new account officer was Ms. Carmela Ferreira ("Ms. Ferreira").  The telephone call was passed on to Ms. Ferreira.  (Plaintiff Delio Filho, Trial Tr. 42-43, 92-93.) Plaintiff Delio Filho's subsequent communications with Ms. Ferreira were all in Portuguese. (Plaintiff Delio Filho, Trial Tr. 53.)

### A.   Ms. Ferreira's Communications With Plaintiff Delio Filho In Fourth Quarter 2006 and January 2007.

20.  According to Plaintiff Delio Filho, in that first call, Defendant Bank officer Ms. Ferreira said that she would study the situation because the money had been not earning any yield.  Plaintiff Delio Filho told Defendant Bank officer Ms. Ferreira what he had said to Mr. Naslausky, that he (Plaintiff Delio Filho) intended to buy real estate in Brazil for his family with the account monies, that he would need the monies upon demand and that he wanted no risk taken with his account monies.  At the time, Plaintiff Delio Filho was looking not to incur more losses, and he did not tell Ms. Ferreira that he wanted a higher return.  According to Plaintiff Delio Filho, Defendant Bank officer Ms. Ferreira said she guaranteed the principal and Plaintiff Delio Filho would never lose the principal.  (Plaintiff Delio Filho, Trial Tr. 44-46, 93-96, 100-101.)  Plaintiff Delio Filho felt that Ms. Ferreira would take care of his account.  (Plaintiff Delio Filho, Trial Tr. 57.)  Ms. Ferreira did not testify.  (*See* Pre-Trial Order Section D & Trial Tr..)  Peter Javier for the Bank was not privy to any of telephone communications that Ms. Ferreira had with Plaintiff Delio Filho.  (Peter Javier, Trial Tr. 227.)

21.  Plaintiff Delio Filho spoke a few times with Ms. Ferreira in 2006, but Plaintiff Delio

Filho did not speak with Ms. Ferreira at all in 2007, 2008 and 2009. Plaintiff Delio Filho did not

have any in person meetings with Ms. Ferreira. (Plaintiff Delio Filho, Trial Tr. 44-45, 58.)

    22. A collection of e-mails that Ms. Ferreira sent to Plaintiff Delio Filho in Portuguese

regarding Plaintiff Delio Filho's account at Defendant Bank and the translation of those e-mails into

English was received in evidence as JX 4. (Stip. Fact 11; JX 4, SNB-SF 000598 to SNB-SF 00614.)

Another collection of e-mails between Defendant Bank and Plaintiff Delio Filho regarding Plaintiff

Delio Filho's account at Defendant Bank, in its Portuguese original and English translation, was

received in evidence as JX 5. (Stip. Fact 12; JX 5, 00062P to 00126P.)

    23. In an e-mail dated December 13, 2006, Ms. Ferreira outlined some possibilities for

investing funds with Plaintiff Delio Filho's account monies, which had not been invested in any

securities since the jumbo CD had matured in September 2006. In the December 13, 2006 email,

Ms. Ferreira identified, to Plaintiff Delio Filho, two fixed income securities: one issued by National

Steel S.A. and one by General Electric. Ms. Ferreira also raised the possibility of investing in

Structured Notes paying variable income. Plaintiff Delio Filho, however, was "indifferent" to Ms.

Ferreira's proposals, as he was not able to analyze the proposed investments. In particular, Plaintiff

Delio Filho had no experience with Structured Notes and never understood them. (JX 5, 00091P-

00092P, 00124P-00125P; Plaintiff Delio Filho, Trial Tr. 46-47, 97-98.)

    24. In an e-mail dated the same day, December 13, 2006, Plaintiff Delio Filho thanked Ms.

Ferreira for sending the information on the investments and stated that he would examine it carefully.

He also expressed the hope that measures were being taken in order to credit his account for fees that

had been incurred while monies sat unattended in a checking account. Plaintiff Delio Filho stated

in his testimony that he was being "polite" in writing that he would review the proposed investments,

but in fact he did not consider them.  Plaintiff Delio Filho did not authorize any transactions, and no investments were made in response to Ms. Ferreira's email dated December 13, 2006.  (JX 5, 00090P, 00123P; Plaintiff Delio Filho, Trial Tr. 98-102.)

25.  On January 11, 2007, Ms. Ferreira sent to Plaintiff Delio Filho two e-mails.  The first e-mail noted that the only investment made in Plaintiff Delio Filho's account since 2002 had been CDs and that she (Ms. Ferreira) had been looking into some products for a better return. That first e-mail offered two options: one option was a note from National Steel S.A. (Vicunha Group) with perpetual maturity; the second option was commercial paper that at the end of 90 days either would pay out principal plus interest or would pay shares in Gerdau, Vale do Rio Doce or Banco Bradesco. Ms. Ferreira's second e-mail of January 11, 2007, stated that Ms. Ferreira had obtained approval for a credit for the time that Plaintiff Delio  Filho's funds had been sitting in the account, which totaled $300, and that the second investment option, the one involving buying commercial paper, was not then available.   (JX 4, SNB-SF 00598 to SNB-SF 00600, SNB-SF 00606 to SNB-SF 00608.)

26.  As to Plaintiff Delio Filho's ability to evaluate the investments proposed by Ms. Ferreira in her January 11, 2007 e-mail, Plaintiff Delio Filho said he had "[n]one, absolutely none." (Plaintiff Delio Filho, Trial Tr. 48.)  Plaintiff Delio Filho did not know what kind of company that Gerdau was and understood only vaguely what kind of company Vale do Rio Doce was. (Plaintiff Delio Filho, Trial Tr. 47-48.)  No investments were made in response to Ferreira's e-mails dated January 11, 2007.  (JX 3, SNB-SF 00183 to SNB-SF 00185.)

**B.      The Unauthorized Structured Note Transactions.**

27.  The February 2007 statement for Plaintiff Delio Filho's account shows a transaction for American Express commercial paper for $134,560.50.  The March 2007 statement for Plaintiff

Delio's account shows that the American Express commercial paper was sold for $135,000.  (Stip. Fact 3; JX 3, SNB-SF 00186 to SBB-SF 00194.)  Plaintiff Delio did not speak to Ms. Ferreira about the American Express commercial paper and did not authorize the transaction. (Plaintiff Delio Filho, Trial Tr. 54, 105.)

28.  On March 7, 2007, Ms. Ferreira sent an e-mail to Plaintiff Delio Filho, stating that "[t]oday, March 7, the Commercial Paper investment we made for you is maturing."  The commercial paper investment was the American Express commercial paper, which according to Ms. Ferreira had made a profit in less than 30 days.  Ms. Ferreira's March 7, 2007 e-mail further discussed a Structured Note involving a share of Vale do Rio Doce with two scenarios depending upon whether the share will be devalued more than 20% compared to the share price on the first investment date.  According to Ms. Ferreira's March 7, 2007 e-mail, if the share did not devalue more than 20%, Plaintiff Delio would get the principal plus the interest; if the share did devalue more than 20%, Plaintiff Delio would receive the principal in shares of Vale de Rio Doce and interest in cash. Ms. Ferreira concluded the e-mail with "LET'S DO IT??"  (JX 4, SNB-SF 00600 to SNB-SF 00602, SNB-SF 00608 to SNB-SF 00610.)

29.  Plaintiff Delio Filho did not authorize any transactions in Structured Notes either in writing or by telephone -- indeed, as noted above, Plaintiff Delio Filho had no phone calls at all with Ms. Ferreira in 2007.  Plaintiff Delio Filho had no experience in Structured Notes.  Plaintiff Delio Filho had no understanding of Structured Notes.  Plaintiff Delio Filho did not have any experience in the practice of law so as to give him an understanding of Structured Notes.  From Ms. Ferreira's March 7, 2007 e-mail, Plaintiff Delio Filho did not derive an understanding of the risks of Structured Notes,but did have the impression that Defendant Bank was investing in Structured Notes.  (Plaintiff

-11-

Delio Filho, Trial Tr. 46-47, 54-57, 109, 115-118; JX 4, SNB-SF 00600 to SNB-SF 00602, SNB-SF

00608 to SNB-SF 00610.)

    30.  The parties' Stipulation of Fact No. 14 provides as follows:

        From March 2007 through August 2008, 12 Structured Notes were purchased
with monies in Plaintiff Delio's account.   The following chart summarizes the
purchase, sell and gain/loss information as to these Structured Notes according to the
monthly statements for Plaintiff Delio's account collected in PX 3:

| PURCHASE | DESCRIPTION | FACE | SELL DATE | SALE PROCEEDS | GAIN/LOSS | COMMENT |
|---|---|---|---|---|---|---|
| 3/2/2007 | RIO 12% | 100,000.00 | 6/8/2007 | 103,000.00 | 3,000.00 | |
| 3/12/2007 | GGB/SID/UBB 16% | 50,000.00 | 6/19/2007 | 52,000.00 | 2,000.00 | |
| 7/18/2007 | RIO/SID/ABV 19% | 142,000.00 | 10/25/2007 | 148,745.00 | 6,745.00 | |
| 10/18/2007 | RIO/SID/ABV 19% | 145,000.00 | 1/23/2008 | 151,887.50 | 6,887.50 | |
| 1/17/2008 | RIO/SID/ABV 22.08% | 50,000.00 | 4/22/2008 | 52,760.00 | 2,760.00 | |
| 3/11/2008 | BBD/UBB/ITU 24% | 50,000.00 | 6/16/2008 | 53,000.00 | 3,000.00 | |
| 4/18/2008 | RIO/PBR/ITU15.5% | 55,000.00 | 7/24/2008 | 57,131.25 | 2,131.25 | |
| 4/18/2008 | POT/MOS 28.155% | 50,000.00 | 7/28/2008 | 53,519.00 | 3,519.00 | |
| 6/9/2008 | RIO 13.01% | 50,000.00 | 9/15/2008 | 1,826.00 | -48,174.00 | |
| | | | 11/10/2008 | 339.66 | 339.66 | Int/Div |
| | | | 5/8/2009 | 303.54 | 303.54 | Int/Div |
| | | | 11/9/2009 | 300.61 | 300.61 | Int/Div |
| | | | 5/7/2010 | 258.26 | 258.26 | Int/Div |
| | | | 6/1/2010 | 34,181.42 | 34,181.42 | Market Value RIO Shares |
| 7/22/2008 | RIG/APA/AGU | 60,000 | 7/29/2009 | 840.07 | -59,159.93 | |
| | | | 1/8/2010 | 24.75 | 24.75 | Int/Div |
| | | | 6/1/2010 | 31,807.46 | 31,807.46 | Market Value AGU Shares |
| 7/28/2008 | POT/MOS/MON | 55,000.00 | 8/13/2008 | 58,025.00 | 3,025.00 | |
| 7/31/2008 | POT/MOS/MON | 60,000.00 | 2/4/2009 | 1,885.20 | -58,114.80 | |
| | | | 2/19/2009 | 21.00 | 21.00 | Int/Div |
| | | | 5/21/2009 | 21.00 | 21.00 | Int/Div |
| | | | 8/20/2009 | 21.00 | 21.00 | Int/Div |
| | | | 11/19/2009 | 21.00 | 21.00 | Int/Div |
| | | | 12/3/2009 | 546.00 | 546.00 | Int/Div |
| | | | 2/18/2010 | 21.00 | 21.00 | Int/Div |
| | | | 5/20/2010 | 21.00 | 21.00 | Int/Div |
| | | | 6/1/2010 | 18,774.68 | 18,774.68 | Market Value MOS Shares |
| TOTAL RETURN ON INVESTMENTS | | | | | -45,718.60 | |

-12-

31.   Plaintiff Delio Filho did not authorize any of the purchases of the 12 Structured Notes reflected in the parties' Stipulation of Fact No. 14 and was not even told about the purchase and sale of 7 of these Structured Notes.  (Plaintiff Delio Filho, Trial Tr. 64, 86, 115-116, 134-148, 152-153.) As reflected in the collections of emails contained in JX 4 and JX 5 and according to Plaintiff Delio Filho's testimony, from May 2007 through October 2008, Plaintiff Delio did not communicate at all with Defendant Bank.  (Plaintiff Delio Filho, Trial Tr., 44-45, 58, 121-122, 136-147; JX 4, 00602, 00610-00611; JX 5, 0113P-0115P.)

32.   Before Ms. Ferreira's March 7, 2007 e-mail, on March 2, 2007, a purchase was made by Defendant Bank officer Ms. Ferreira of a Structured Note for $100,000 issued by Lehman Brothers at 12% based on Vale do Rio Doce; and on March 12, 2007, a purchase was made by Ms. Ferreira of a Structured Note for $50,000 issued by Lehman Brothers at 16% based on GGB/SID/UBB (Gerdau, Cia Siderurgica National and Unibanco).  (Stip. Fact 14; JX 3, SNB-SF 00191 to SBB-SF 00196.)  Plaintiff Delio Filho did not authorize these purchases of these Structured Notes.  (Plaintiff Delio Filho, Trial Tr. 64, 86, 115-116, 152-153.)  Ms. Ferreira did send an e-mail dated March 27, 2007, to Plaintiff Delio Filho informing him after the fact of the purchases of two Structured Notes, and Plaintiff Delio Filho did not respond.  (Plaintiff Delio Filho, Trial Tr. 119, JX 4, 00602, 00610; JX 5, 0116P.)

33.   On July 26, 2007, a Rio/SID/ABV Structured Note at 19% was purchased by Defendant Bank officer Ms. Ferreira without Plaintiff Delio Filho's authorization and without Plaintiff Delio Filho ever being informed about the purchase and sale.  (Stip. Fact 14; JX 3, SNB-SF 00207 to SNB-SF 00211; Plaintiff Delio Filho, Trial Tr. 64, 86, 134-139, 152-153.)

34.   On October 26, 2007, another Rio/SID/ABV Structured Note at 19% for $145,000 was

purchased by Defendant Bank officer Ms. Ferreira without Plaintiff Delio Filho's authorization and without Plaintiff Delio Filho ever being informed about the purchase and sale.  (Stip. Fact 14; JX 3, SNB-SF 00220 to SNB-SF 00224; Plaintiff Delio Filho, Trial Tr. 64, 86, 139-140, 152-153.)

35.  On January 17, 2008, another Rio/SID/ABV Structured Note at 22.08% for $50,000 was purchased by Defendant Bank officer Ms. Ferreira without Plaintiff Delio Filho's authorization and without Plaintiff Delio Filho ever being informed about the purchase and sale.  (Stip. Fact 14; JX 3, SNB-SF 00233 to SNB-SF 0027; Plaintiff Delio Filho, Trial Tr. 64, 86, 141-142, 152-153.)

36.  On March 11, 2008, BBD/UBB/ITU Structured Note at 24% for $50,000 was purchased by Defendant Bank officer Ms. Ferreira without Plaintiff Delio Filho's authorization and without Plaintiff Delio Filho ever being informed about the purchase and sale.  (Stip. Fact 14; JX 3, SNB-SF 00242 to SNB-SF 00246; Plaintiff Delio Filho, Trial Tr. 64, 86, 142-143, 152-153.)

37.  On April 18, 2008, a RIO/PBR/ITU Structured Note at 15.5% for $55,000 was purchased by Defendant Bank officer Ms. Ferreira without Plaintiff Delio Filho's authorization and without Plaintiff Delio Filho ever being informed about the purchase and sale.  (Stip. Fact 14; JX 3, SNB-SF 00247 to SNB-SF 00251; Plaintiff Delio Filho, Trial Tr. 64, 86, 144-145, 152-153.)

38.  On April 18, 2008, a POT/MOS Structured Note at 28.15% for $50,000 was purchased by Defendant Bank officer Ms. Ferreira without Plaintiff Delio Filho's authorization and without Plaintiff Delio Filho ever being informed about the purchase and sale.  (Stip. Fact 14; JX 3, SNB-SF 00247 to SNB-SF 00251; Plaintiff Delio Filho, Trial Tr. 64, 86, 144-145, 152-153.)

39.  On June 9, 2008, a Rio 13.01% Structured Note for $50,000 was purchased by Defendant Bank officer Ms. Ferreira without Plaintiff Delio Filho's authorization and without Plaintiff Delio Filho ever being informed about the purchase and sale.  (Stip. Fact 14; JX 3, SNB-SF 00257;

-14-

Plaintiff Delio Filho, Trial Tr.  64, 86, 145-146, 152-153.)

40.  On July 22, 2008, a RIG/APA/AGU Structured Note for $60,000 was purchased by Defendant Bank officer Ms. Ferreira without Plaintiff Delio Filho's authorization and without Plaintiff Delio Filho being informed about the purchase for 2½ months.  (Stip. Fact 14; JX 3, SNB-SF 00262; Plaintiff Delio Filho, Trial Tr. 64, 86, 146-147, 152-153; JX 4, SNB-SF 00602 to SNB-SF 00604, SNB-SF 00611 to SNB-SF 00612; JX 5, 00075P to 00076P, 00108P-00109P.)

41.  On July 28, 2008 of a POT/MOS/MON structured note for $55,000 was purchased by Defendant Bank officer Ms. Ferreira without Plaintiff Delio Filho's authorization and without Plaintiff Delio Filho being informed about the purchase for 2½ months.  (Stip. Fact 14; JX 3, SNB-SF 00267; Plaintiff Delio Filho, Trial Tr. 64, 86, 146-147, 152-53; JX 4, SNB-SF 00602 to SNB-SF 00604, SNB-SF 00611 to SNB-SF 00612; JX 5, 00075P to 00076P, 00108P-00109P.)

42.  On July 31, 2008, a POT/MOS/MON Structured Note for $60,000 was purchased by Defendant Bank officer Ms. Ferreira without Plaintiff Delio Filho's authorization and without Plaintiff Delio Filho being informed about the purchase for 2½ months.  (Stip. Fact 14; JX 3, SNB-SF 00267; Plaintiff Delio Filho, Trial Tr. 64, 86, 146-147, 152-153; JX 4, SNB-SF 00602 to SNB-SF 00604, SNB-SF 00611 to SNB-SF 00612; JX 5, 00075P to 00076P, 00108P-00109P.)

43.  On cross-examination, Plaintiff Delio Filho testified he did not believe that Defendant Bank could make securities trades without express permission and further testified that he did not authorize the Structured Note transactions:

> Q Now, at the time you opened the account at Safra, did you believe that Safra could make trades in your account without your express permission, either in writing or orally?
>
> A Of course I didn't.  I would think that this would be absurd.

THE COURT: "Of course, I didn't" is what he said.

. . . .

Q So you admit that the trades that were made in your account were authorized by you, either in writing or orally?

A Of course not. I have never authorized any transactions ever, neither by writing or verbally.

Q So you believe that Safra did make transactions in your account that were not authorized by you, is that correct?

A I did not need to believe. All you have to do is to review the files.  All you have to do is look at the documents related to it.

(Plaintiff Delio Filho, Trial Tr. 85-86.)

44.   With respect to these 12 Structured Notes, Plaintiff Delio Filho never had, with Defendant Bank officer Ms. Ferreira, any communication in which Plaintiff Delio Filho raised, on his initiative, the buying of any kind of securities, much less the Structured Notes; Plaintiff Delio Filho never knew anything about Structured Notes in order to bring them to the Defendant Bank's attention; Plaintiff Delio Filho never received directly any Term Sheets or other disclosure materials for the Structured Notes; and Ms. Ferreira never advised Plaintiff Delio Filho of the risks of the Structured Notes.  (Plaintiff Delio Filho, Trial Tr. 55, 57-58.)

**C.   Ms. Ferreira's October 2008 Statements To Plaintiff Delio Filho.**

45.   On October 2, 2008, Defendant Bank officer Ms. Ferreira sent an e-mail to Plaintiff Delio asking if he received the email, to confirm he had.  That same day, October 2, 2008, Plaintiff Delio Filho replied, thanking Ms. Ferreira for her message and saying he was waiting for Ms. Ferreira's information. (JX 5, 00075P-00076P, 00109P-00110P; Plaintiff Delio Filho, Trial Tr. 57, 122.)  After that one e-mail, from October 2008 to July 2009, Plaintiff Delio Filho did not

communicate with Defendant Bank.   (JX 4, 00602-00605, 00611-00613; JX 5, 00075, 0108P; Plaintiff Delio Filho, Trial Tr. 58, 127.)

46.   On October 6, 2008, Defendant Bank officer Ms. Ferreira sent an e-mail to Plaintiff Delio providing "consolidated information."   Ms. Ferreira wrote that Plaintiff Delio Filho  and Ms. Ferreira "began the relationship on September 26, 2006, when [Plaintiff Delio] had $149,276.81." Ms. Ferreira went on to state that "[s]ince that time, the investment has been done in Structured Notes" and described the three Structured Notes in which Plaintiff Delio Filho was then invested: (1) $60,000 in Potash/Mosaic/Monsanto (fertilizer companies) with a maturity date of February 4, 2009; (2) $60,000 in Agrium (fertilizer company)/Apache (natural gas)/Transocean (deep water oil drilling) with a maturity of July 29, 2009; and (3) $50,000 in Vale do Rio Doce, described as "[o]ne of the largest companies with strong valuation trend in 2009." Ms. Ferreira added that "all companies that comprise your Portfolio, without exception, are solid companies, without any credit problem, the balance sheets are in order and they produce products with greater demand than supply."  (JX 4, 00602-00605, 00611-00613; JX 5, 00075P-00076P, 00108P to 00109P.)  Plaintiff Delio Filho did not respond to Ms. Ferreira's October 6, 2008 e-mail.  (Plaintiff Delio Filho, Trial Tr. 127.)

47.   Ms. Ferreira, in her October 6, 2008 e-mail, did not refer to the seven Structured Notes that had been bought in the period July 18, 2007 and June 9, 2008 and then sold before her October 6, 2008 e-mail.  (Stip Fact 14; JX 4, 00602-00605, 00611-00613; JX 5, 00075P-00076P, 00108P-00109P.)

**D.    John Geelan's Expert Testimony: The Very High Risk Nature of the Structured Notes Unsuitable For and Not Properly Disclosed To Plaintiff Delio Filho.**

48.   John Geelan, an expert called by Plaintiff Delio Filho, spent 15 years at Goodbody &

-17-

Company (1955-1970), a broker-dealer firm, and then 31 years at Merrill Lynch & Co. (1970-2001) in various positions: Customer Account Control - V.P., Manager (1991-2001); Regulatory/New Product Specialist - V.P., Manager (1982-1991); Margin Specialist - V.P., Manager (1971-1982); and Margins Department Manager (1970-1971).  As Customer Account Control - V.P., Manager, Mr. Geelan had to determine whether a customer was in compliance with regulations such as Regulation T of the Federal Reserve Board.  As Regulatory/New Product Specialist - V.P., Manager, he had interface with governmental regulatory agencies, including the Federal Reserve Board, and he incorporated new products into customer accounts. His areas of expertise include Structured Products (which include Collateralized Mortgage Obligations and Structured Notes), options, Customer Margin account regulations, futures and credit risk.  Mr. Geelan sat through most of the trial testimony given in the case and read much of the exhibits.  (John Geelan, Trial Tr. 154-162; PX 1.)  Following a lengthy voir dire, the Court overruled Defendant Bank's objection to Mr. Geelan being recognized as an expert in structured products.  (John Geelan, Trial Tr. 161-176.)

49.  Mr. Geelan explained that a Structured Note is a combination of notes, stocks or options structured by brokers and banks to have a percentage rate and a short term due date that may result in the Structured Note holder owing stock.  (John Geelan, Trial Tr. 177, 179.)  A Structured Note has "a tremendous amount of risk," a "very high" risk.  (John Geelan, Trial Tr. 177, 179.)  Stock is "less risky" than the Structured Notes in this case.  (John Geelan, Trial Tr. 191.)  A Structured Note can result in the holder owning stock of a company by the Structured Note forcing the holder to buy the underlying company's stock at a higher price than the stock is selling for in the market.  (John Geelan, Trial Tr. 177.)  The high interest rate of a Structured Note signals that there is high risk. (John Geelan, Trial Tr. 178-179.)   Mr. Geelan further explained that a Structured Note is a "very

complex" security.  (John Geelan, Trial Tr. 178.)

50.   Mr. Geelan was asked to compare the description of a Vale d0 Rio Structured Note provided by Ms. Ferreira in her e-mail dated March 7, 2007, and the Term Sheet for that Structured Note.  "  (John Geelan, Trial Tr. 179- 183 JX 4, SNB-SF 00608 to SNB-SF 00609; DX A, pp. 540-548.)  Mr. Geelan called Ms. Ferreira's March 7, 2007 e-mail "poorly worded," saying "very little," and explained that for a person to purchase a Structured Note, the disclosure in the Term Sheet was what was required because it "gives all the terms of the contract." (John Geelan, Trial Tr. 183-184.)  In the marketplace, Structured Notes are difficult to liquidate because it is hard to find buyers, as Structured Notes are complex products that are "not traded on an exchange" and are "very illiquid." (John Geelan, Trial Tr. 184-185.)  Also, the Term Sheet has a legend that is a warning about "investment risk, including possible loss of principal" that is not contained in Ms. Ferreira's e-mail. (John Geelan, Trial Tr. 185; JX 4, SNB-SF 00608 to SNB-SF 00609; DX A, pp. 540-548.)  In Mr. Geelan's opinion, what was contained in Ms. Ferreira's e-mail dated March 7, 2007, concerning the Vale do Rio Structured Note was not adequate disclosure, it was "very sketchy" and "doesn't give enough information like a prospectus might"; Ms. Ferreira's e-mail "explains the contract in a couple of lines while the trade confirmation gives all of the facts in the case."  (John Geelan, Trial Tr. 187-188; JX 4, SNB-SF 00608 to SNB-SF 00609; DX A, pp. 540-548.)

51.   According to Mr. Geelan, people who buy Structured Notes are "sophisticated investors" with "high net worth, at least a couple of million of dollars, and it is not for the average person." (John Geelan Trial Tr. 186-187.)  Structured Notes were not suitable for Plaintiff Delio Filho.  (John Geelan, Trial Tr. 186-187.)

52.   That Plaintiff Delio Filho made money on most of the Structured Notes did not change

-19-

Mr. Geelan's opinion, as it did not change the risk factor.  (John Geelan, Trial Tr. 194-195.)  The first four Structured Notes that made money were bought in 2007 before the financial crisis; the next four Structured Products that made money were bought in the period January to April 2008 about the time when the financial crisis began; three of the last four Structured Products bought in June and July 2008 lost a lot of money.  (John Geelan Trial Tr. 195-196; Stip. Fact 14.) Mr. Geelan explained that "[t]he later purchases lost far more than all of the others combined." (John Geelan, Trial Tr. 196.)  Mr. Geelan disparaged the notion that making money on 10 out of 15 or 13 out of 15 meant anything when you can get "whacked" once for far more money that what was earned. (John Geelan, Trial Tr. 196-197.)  Mr. Geelan explained that "if you make 5 transactions and you make $100 on each one of them, that is $400, but the fifth one, you lose $50,000, that one transaction can ruin you."  (John Geelan, Trial Tr. 197.)  In this case, there was a "staggering loss" from the Structured Products that did lose money.  (John Geelan, Trial Tr. 198.)

53.  When Mr. Geelan was asked about Plaintiff Delio Filho being the one who chose when to sell the equities that resulted from three of the Structured Notes, Mr. Geelan said that Plaintiff Delio Filho did not authorize the purchase of the Structured Notes.  (John Geelan, Trial Tr. 199.)

## VI.   The Account Under Defendant Bank Officer Mr. Amorim.

54.  In late July 2009, Plaintiff Delio Filho called Defendant Bank because he wanted to use the funds in the account for purchasing real estate in Brazil.  Plaintiff Delio Filho was told that Ms. Ferreira no longer worked at the Bank and that the person who would be dealing with Plaintiff Delio Filho was Mr. Marco Amorim ("Mr. Amorim").  Mr. Amorim informed Plaintiff Delio Filho of his account balance, which at the time was half its original value.  Plaintiff Delio Filho was outraged and said there had to be some mistake.  Plaintiff Delio Filho described Mr. Amorim as being "cold"

-20-

during the phone call.  (Plaintiff Delio Filho, Trial Tr. 58-59, 129.)  Mr. Amorim did not testify.

(*See* Pre-Trial Order Section D & Trial Tr..)

55.  Following the phone call, Mr. Amorim did not call Plaintiff Delio Filho back, but rather, on August 14, 2009, sent an e-mail to Plaintiff Delio Filho.  In that e-mail, Mr. Amorim denied error on the Defendant Bank's part and stated he had not identified any messages from Ms. Ferreira that guaranteed the principal.  Mr. Amorim further stated that as a good faith business venture, Defendant Bank would like to propose to Plaintiff Delio Filho favorable conditions for financing.  Plaintiff Delio Filho, however, did not ask for a loan from Defendant Bank, he did not need a loan in 2009, and he did not respond to Mr. Amorim's e-mail.  (JX 4, SNB-SF 00604 to SNB-SF 00605,  SNB-SF 00612 to SNB-SF 00613; Plaintiff Delio Filho, Trial Tr. 60, 130.)

56.  In late 2009, after Mr. Amorim's e-mail, Plaintiff Delio Filho, on advice of counsel, requested the documents that had accumulated in "Hold Mail" at Defendant Bank, and Defendant Bank complied with the request.  Among the documents received by Plaintiff Delio Filho in December 2009 were: bank account term pages, the International Banking Terms & Conditions, monthly account statements and Term Sheets.  (Plaintiff Delio Filho, Trial Tr. 50-52, 60, 131-133.)

57.  In an e-mail dated May 26, 2010, Plaintiff Delio Filho gave written authorization to Defendant Bank to sell the three equities -- Agrium, Mosaic and Vale -- then in Plaintiff Delio Filho's account.  The three equities were sold on June 1, 2010 at a loss: a net amount of $31,807.46 was received for Agrium; a net amount of $18,774.68 was received for Mosaic; and $34,181,42 for Vale.  In total, the three stocks -- Agrium, Mosaic and Vale -- were sold with credits given in the total amount of $84,763.56.  (Stip. Fact 15; JX 5, 00065P, 00098P; JX 3, SNB-SF 00386 to SNB-SF 00390; Plaintiff Delio Filho, Trial Tr. 61, 63-64.)

-21-

58. Plaintiff Delio Filho sold the securities when he did because he needed to make a cash deposit for the real estate in Brazil, the reason about which he had told Mr. Naslausky in July 2002 when opening the bank account.  After the sale of the three securities, Plaintiff Delio Filho had less money in the account than he had when he opened the account, even taking into account the $9,500 withdrawn from the account from October 2003 to January 2005.  (Plaintiff Delio Filho, Trial Tr. 61, 64-65, 90; Stip. Fact 16.)

59.  Plaintiff Delio Filho could not have purchased the real estate in Brazil in 2003 through 2008 because Plaintiff Delio Filho did not have the resources to make the purchase; that situation changed in 2008 when Plaintiff Delio Filho's wife received inheritance monies, so that the inheritance monies and the monies in the account at Defendant Bank together would be enough for Plaintiff Delio Filho to buy the real estate.  The particular piece of real estate, however, was part of an estate that was subject to the control of a Brazilian court. In 2010, that Brazilian court issued an order requiring that deposit to be made by Plaintiff Delio Filho; and it was then that Plaintiff Delio Filho directed the sale of securities in his account and withdrew the money.  To makeup for the reduced amount of money in the account at Defendant Bank, Plaintiff Delio Filho had to borrow and did take out a loan from a Brazilian bank in an amount of 90,000 Brazilian Reals (about $50,000 in U.S. dollars).  (Plaintiff Delio Filho, Trial Tr. 65-66, 89-90, 130-131, 151-152; JX 3, SNB-SF 00386 to SNB-SF 00390.)

## VII.   The Losses In The Account At Defendant Bank.

60.   The parties' Stipulation of Fact No. 16 provides:

A summary chart of "cash in" and "cash out" in Plaintiff Delio [Filho]'s account at [Defendant Bank] SNB is marked for trial and receipt in evidence as JX 6.  The "cash in" is shown to be a deposit in 2002 of 160,000 Euros converted to

$160,000, and the "cash out" is shown to total $104,438 resulting from: a withdrawal of $3,000 on October 23, 2003; a withdrawal of $4,000 on March 12, 2004; a withdrawal of $2,500 on January 5, 2005; a withdrawal of $18,093 on June 1, 2010; a withdrawal of $43,000 on June 2, 2010; and a withdrawal of 33,846 on June 3, 2010. The arithmetic difference, without considering the time value of money, is shown to be $55,561. Plaintiff Delio [Filho] claims that $55,561 might be equivalent to a loss but it does not represent what Plaintiff Delio lost in interest and profit. The chart has been marked for trial and receipt in evidence as JX 6. The chart is as follows:

| Cash In | €160,000 (converted to $160,000) |
|---|---|
| **Cash Out Total** | **-$104,439** |
| 10/23/2003 | -$3,000 |
| 3/12/2004 | -$4,000 |
| 1/5/2005 | -$2,500 |
| 6/1/2010 | -$18,093 |
| 6/2/2010 | -$43,000 |
| 6/3/2010 | -$33,846 |
| **Total Loss** | **$55,561** |

61. Assuming that the account monies were invested instead in certificates of deposit bearing interest rates from the Board of Governors of the Federal Reserve System, the amount in Plaintiff Delio Filho's account in June 2010 would have been $185,661, up from the $150,500; that differential is $34,161, which added to the loss in the account shown in JX 6 of $55,561 totals $90,722. (PX 2; Trial Tr. 27.)

## PROPOSED CONCLUSIONS OF LAW

1. Plaintiff Delio Filho tried the case on causes of action for: (I) the private cause of action under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5; (II) breach of contract; (III) breach of fiduciary duty; and (IV) common law fraud. (Trial Tr. 4.)

I.     **Plaintiff Delio Filho's Rule 10b-5 Violation Claim.**

2.  Based on the trial record, the Court should enter judgment for Plaintiff Delio Filho on his private right of action for violation of S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b).  The U.S. Supreme Court has recognized that courts have implied from § 10(b) of the Securities Exchange Act and Rule 10b-5 a private damages action resembling but not identical to a common law tort action for fraud.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975).  The preponderance of the evidence establishes that the elements of the 10b-5 action have been satisfied, particularly the element of *scienter*.  *Herman & MacLean v. Huddleston*,, 459 U.S. 375 (1983) (preponderance the burden of proof for 10b-5).

A.     **Defendant Bank Was Subject To The Antifraud**
       **Provisions Of The Securities Exchange Act of 1934.**

3.  Section 10(b) of the Securities Exchange Act of 1934 states that it is unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, use or employment of any deceptive device."  S.E.C. Rule 10b-5,  17 C.F.R. § 240.10b-5, forbids, in connection with the purchase or sale of any security, (a) the employment of any scheme, device or artifice to defraud, (b) the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statement

made . . . not misleading," and (c) the engaging in any act, practice or course operating as a fraud or deceit upon any person.

4. Any person or entity, including a lawyer, accountant or bank, who employs a manipulative device or makes a material misstatement or omission on which the purchaser or seller of securities relies may be liable as a primary violator under Rule 10b-5 assuming that all of the requirements for primary liability under Rule 10b-5 are met. *Central Bank of Denver N.A. v. First Interstate Bank of Denver N.A.*, 511 U.S. 164, 191 (1994); *Janus Capital Group, Inc. v. First Derivative Traders*, __ U.S. __, 131 S.Ct. 2296 (2011); *Overton v. Todman & Co.*, 478 F.3d 479, 484 (2d Cir. 2007). It follows that Defendant Bank in relation to its customer was and is subject to the antifraud provisions of the Securities Act of 1934 and specifically Rule 10b-5.

5. Defendant Bank's Peter Javier was simply wrong as a matter of law to say that banks were not subject to the antifraud provisions of the federal securities laws before Regulation R. (Peter Javier, Trial Tr. 204-205.) There is no legal authority supporting Mr. Javier's incorrect assertion. Further, while 15 U.S.C. § 78c(4)(B) and Regulation R at 17 C.F.R. §§ 247.700-247.781 exempt a bank from categorization as a broker or dealer in certain defined circumstances and thus exempt from potential liability under the federal securities laws as a broker or dealer, nowhere in 15 U.S.C. § 78c(4)(B) and Regulation R is there a recognition of the application of the antifraud provisions of the Securities Act of 1934 which did not previously apply. Further, nowhere in 15 U.S.C. § 78c(4)(B) and Regulation R is there recognized a wholesale exemption from the antifraud provisions of the Securities Act of 1934. To the contrary, the statutory and regulatory exemptions from broker and dealer status are safe harbors from what otherwise would be potential liability as a broker or dealer under the federal securities laws, including the antifraud provisions.

6.  The general denial by Defendant Bank's Peter Javier that Defendant Bank is a broker-dealer (Peter Javier, Trial Tr. 208-209) certainly does not negate the application of statute and regulations to the particular facts of this case determining whether Defendant Bank is a broker or dealer.  The definition of a broker in the Securities Exchange Act of 1934 is contained in 15 U.S..C. § 78c(4)(A): "The 'broker' means any person engaged in the business of effecting transactions in securities for the account of others."  That is what Bank officer Ms. Ferreira did here with respect to Plaintiff Delio Filho's account.  The exemptions for Banks from recognition as a broker recognized in 15 U.S.C. § 78c(4)(B) relate to such matters as trust activities, stock option plans, sweep accounts and safekeeping and custody activities, and the exemptions recognized in Regulation R provide more specific treatment to the categories recognized in 15 U.S.C. § 78c(4)(B).  None of these exemptions apply here given the facts of this case -- as opposed to Mr. Javier's denial  of Defendant Bank managing accounts (Peter Javier, Trial Tr. 211).  As established by Findings 23-53 above, the highly risky Structured Note transactions, unsuitable for Plaintiff Delio Filho, were not done as an accommodation for Plaintiff Delio Filho, but rather were originated by Defendant Bank officer Ms. Ferreira, and she did not have authorization ever from Plaintff Delio Filho to engage in them, did not even tell Plaintiff Delio Filho most of the time about the Structured Note transactions and, when making what disclosure she did, did so inadequately without sending the Term Sheets. It follows that when a bank officer acts as Defendant Bank officer Ms. Ferreira did in this case, the Defendant Bank should be treated as a "broker" under the Securities Exchange Act of 1934.  At all events, the antifraud provisions of the Securities Act of 1934 apply.

7.  Defendant Bank's Mr. Javier also invoked an exemption in Regulation R for certain sales subject to Regulation S. (Peter Javier, Trial Tr. 210-211.)  This exemption is contained in contained

in 17 C.F.R. § 247.771, which cross-references Regulation S's 17 C.F.R. § 230.903 when a bank acts "as agent." Regulation S, however, has no relevance -- either on its terms or in any authority applying it -- to the application in this case of the antifraud provisions of the Securities Exchange Act of 1934. First of all, Regulation S, 17 C.F.R. §§ 230.601-230.904, relates to the exemption from registration of certain securities and does not relate to the antifraud provisions of the federal securities laws, a point expressly recognized in the Preliminary Notes to Regulation S. Secondly, 17 C.F.R. § 230.903(a) imposes three requirements for deeming a sale to occur outside the United States for an exemption from registration, and those requirements were not satisfied in this case so as to allow a bank not to be considered a "broker": (1) the sale is made in an offshore transaction, which would mean here ignoring that Defendant Bank's offices were in the U.S. (Plaintiff Delio Filho, Trial Tr. 43), and the sale and purchase occurred in the U.S. with the documentation going into "Hold Mail" in the U.S. (Findings 11, 27-47, 55-57); (2) no directed selling efforts were made in the U.S., which Defendant Bank did not prove and was presumptively not satisfied as Defendant Bank's offices were in the U.S.; and (3) the satisfaction of "additional conditions" in 17 C.F.R. § 230.903(b), which were not satisfied here because: the Structured Notes themselves were not issued by foreign issuers that believed there was no substantial U.S. market (John Geelan, Trial Tr. 193-194); there is no evidence that these Structured Notes were sold in an overseas directed offering, backed by a foreign government or were sold to an employee; and offering restrictions were not implemented as to Plaintiff Delio Filho (John Geelan, Trial Tr. 185).

8.   Nor does Regulation D, §§ 230.500-230.508, help Defendant Bank: the provisions of Regulation D do not apply, and Regulation D expressly denies an exemption from the antifraud provisions of the federal securities laws.

**B.     The Preponderance Of The Evidence Established**
**         The Elements Of The 10b-5 Action.**

9.   The elements of a private cause of action under § 10(b) of the Securities Exchange Act

of 1934 and S.E.C. Rule 10b-5 are: (i) in connection with the purchase or sale of a security, (ii) a

material misrepresentation or omission, (iii) is made with *scienter*, (iv) as to which there is

transaction causation (reliance), (v) economic loss and (vi) loss causation.  *Dura Pharmaceuticals,*

*Inc. v. Broudo*, 544 U.S. 336, 341-342 (2005); *Stoneridge Investment Partners, LLC v. Scientific-*

*Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Matrixx Initiatives Inc. v. Siracusano*, __ U.S. __, 131 S.Ct.

1309, 1317 (2011); *In re Flag Telecomn Holdings, Ltd. Securities Litigation*, 574 F.3d 29, 35-36 (2d

Cir. 2009)(cites *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.* for six elements).

*See Delshah Group LLC v. Atit Javeri, et al.,* 2013 WL 2322488 (S.D.N.Y. May 28, 2013) (Forrest,

J.)(discussion of elements in trial decision).  More than a preponderance of the evidence established

these elements.

**(1)    The Structured Notes Were Securities Under**
**        The  Securities Exchange Act of 1934.**

10.   As to the first element of the private cause of action under § 10(b) of the

Securities Exchange Act of 1934 and S.E.C. Rule 10b-5, the Structured Notes were unquestionably "securities"

within the meaning of the federal securities law.  The definition of "security" in Section 3(a)(10) of

the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10), is very broad.  The first quarter of the

statutory definition reads: "The term 'security' means any note, stock, treasury stock, security future,

security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing

agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate,

preorganization certificate or subscription, transferable share, investment contract . . . ." Structured Notes easily fall within this definition of "security."

**(2)   The Preponderance Of The Evidence Established The Material Misstatement Or Omission Element Of The 10b-5 Action.**

11.   The second element of the private cause of action under § 10(b) of the Securities Exchange Act of 1934 and S.E.C. Rule 10b-5 is material misstatement or omission, and a material misstatement or omission is one that "a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 162 (2d Cir. 2000), *citing to Basic Incorporated v. Levinson*, 485 U.S. 224, 231-232 (1988).  In *Basic Incorporated v. Levinson*, 485 U.S. 224, the U.S. Supreme Court adopted the standard of materiality stated in the proxy contest in *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), as also applicable in 10b-5 cases: "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  In *Matrixx Initiatives Inc. v. Siracusano*, __ U.S. __, 131 S.Ct. at 1318, the U.S. Supreme Court reaffirmed the *Basic* "total mix" standard, with the caveat that "§ 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary 'to make . . . statements made, in light of the circumstances under which they were made, not misleading.'"  131 S.Ct. at 1321.

12.   More than a preponderance of the evidence at trial established the material misstatement or omission element of the 10b-5 cause of action.  This case is in part a "material omission" case and in part a "practice or course operating as a fraud or deceit upon any person" case.  *See* S.E.C. Rule 10b-5, 17 C.F.R. § 240.10b-5.  As established by Findings 22-53 above, Defendant Bank did not

-29-

inform Plaintiff Delio Filho most of the time that Defendant Bank was using his account monies were used for transactions in Structured Notes; and when disclosure was made, Defendant Bank put Plaintiff Delio's funds into high risk Structured Notes without a disclosure of the high risks associated with such Structured Notes and without the provision of the Term Sheets for the Structured Notes to Plaintiff Delio Filho.  As also established by Findings 22-53 above, the Structured Note transactions were originated by Defendant Bank officer Ms. Ferreira, who put Plaintiff Delio Filho's funds into high risk Structured Notes without Plaintiff Delio's authorization; and Plaintiff Delio Filho's funds were put into high risk Structured Notes that were wholly unsuitable for Plaintiff Delio Filho, who, as established in Findings 3-4 above, was an average person with less than $100,000 in assets other than the monies earned in Portugal and was not a sophisticated investor with millions of dollars of assets.

**(3)      The Preponderance Of The Evidence Established
The *Scienter* Element Of The 10b-5 Action.**

13.  The third element of the private cause of action under § 10(b) of the Securities Exchange Act of 1934 and S.E.C. Rule 10b-5 is *scienter*.  According to the U.S. Supreme Court, [t]o establish liability under § 10(b) and Rule 10-5, a private plaintiff must prove that the defendant acted with *scienter*, 'a mental state embracing intent to deceive, manipulate, or defraud'" and presumably including 'deliberate recklessness.'" *Matrixx Initiatives, Inc. v.Siracusano*, __ U.S. __, 131 S.Ct. at 1323, *quoting Tellalabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007), *quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-194 (1976).

14.  Technically, in *Matrixx Initiatives, Inc. v.Siracusano*, __ U.S. __, 131 S.Ct. at 1323, the question of whether reckless behavior is sufficient to establish liability under § 10(b) and Rule 10b-5

was not decided, as it has not been since _Ernst & Ernst v. Hochfelder_, 425 U.S. at 193-194.  But the Second Circuit, like other Circuits, has ruled that scienter may be established by recklessness "in appropriate circumstances."  _Rolf v. Blyth, Eastman Dillon & Co._, 570 F.2d 38, 46 (2d Cir. 1978); _Ottmann v. Hanger Orthopedic Group_, 353 F.3d 338, 343 (4th Cir. 2003)(lists cases of the Circuits). Further, to quote the Second Circuit, "A plaintiff can establish a strong inference of fraudulent intent in two ways: 'either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" _Chill v. General Electric Company_, 101 F.3d 263, 267 (2d Cir. 1996), _citing San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos._, 75 F.3d 801, 813 (2d Cir. 1996), _Acito v. IMCERA Group, Inc._, 47 F.3d 47, 52 (2d Cir. 1995), and _Shields v. Citytrust Bancorp, Inc._, 25 F.3d 1124, 1128 (2d Cir. 1994).

15.  More than a preponderance of the evidence at trial established the _scienter_ element of the 10b-5 cause of action.  As established by Findings 5-6, 8, 11-12, 20, 23, 26 and 29-53, the record in this case shows that: (a) Defendant Bank had both motive and opportunity to commit fraud (the status of Plaintiff Delio Filho's account in late 2006 was considered unsatisfactory); and (b) there were circumstances that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  Indeed, given the course of conduct described above, the conclusion of "conscious recklessness" jumps out at the reader.  Certainly, Defendant Bank had an opportunity to commit fraud with the way that the account was set up.  _South Cherry St., LLC v. Hennessee Group LLC_, 573 F.3d 98, 108-109 (2d Cir. 2009).  Certainly, also, what was done by Ms. Ferreira as a bank officer in engaging in the highly risk Structured Note transactions with Plaintiff Delio Filho's account monies without Plaintiff Delio Filho's knowledge most of the time, without adequate disclosure

when disclosure was made and without authorization ever carried the risk of fraudulent omission so obvious that Ms. Ferreira and thus the Defendant Bank must have been aware of it. *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187,198 (2d Cir. 2009).

16.   Defendant Bank's argument against *scienter* is a matter of the Defendant Bank not facing up to its conduct.   Ms. Ferreira was not produced by Defendant Bank as a witness; and thus Defendant Bank has no effective way, given the specific circumstances here, of providing proof against Plaintiff Delio Filho's case satisfying the 10b-5 element of *scienter*.

### (4)   The Preponderance Of The Evidence Established The Transaction Causation Element Of The 10b-5 Action.

17.   The fourth element of the private cause of action under § 10(b) of the Securities Exchange Act of 1934 and S.E.C. Rule 10b-5 is "transaction causation" or reliance, that "*but for* the fraudulent statement or omission, the plaintiff would not have entered into the transaction." *Suez Equity v. Toronto-Dominion Bank*, 250 F.3d 87, 95-96 (2d Cir. 2001)(emphasis in original); *see Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 195-196 (2d Cir. 2003). Notably, "[i]n the securities fraud context, transaction causation is presumed when a claim rests on a material omission." *Castellano v. Young & Rubicam, Inc.*, 257 F.2d 171, 186 (2d Cir. 2001); *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 747-741 (2d Cir. 1992).

18.   More than a preponderance of the evidence at trial established the "transaction causation" element of the 10b-5 cause of action.   As discussed above, this case is in part a "material omission" case and in part a "practice or course operating as a fraud or deceit upon any person" case. As established by Findings 22-53 above, Defendant Bank did not inform Plaintiff Delio Filho most

of the time that Defendant Bank was using his account  monies were used for transactions in Structured Notes; and when what disclosure was made, Defendant Bank put Plaintiff Delio's funds into high risk Structured Notes without a without a disclosure of the high risks with such Structured Notes and without the provision of the Term Sheets for the Structured Notes to Plaintiff Delio Filho. As also established by Findings 22-53 above, the Structured Note transactions were originated by Defendant Bank officer Ms. Ferreira, who put Plaintiff Delio Filho's funds into high risk Structured Notes without Plaintiff Delio's authorization.  Where a Bank officer "rode" an account in the manner that Bank officer Ms. Ferreira did with respect to Plaintiff Delio Filho's account, there is no doubt about "transaction causation."

### (5)     The Preponderance Of The Evidence Established The Economic Loss Element Of The 10b-5 Action.

19.  The fifth element of the private cause of action under § 10(b) of the Securities Exchange Act of 1934 and S.E.C. Rule 10b-5 is economic loss.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. at 341-342; *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. at 157; *In re Flag Telecomn Holdings, Ltd. Securities Litigation*, 574 F.3d at 35-36.  The measure of damages for such economic loss in a private cause of action under § 10(b) of the Securities Exchange Act of 1934 and S.E.C. Rule 10b-5 is governed by § 28(a) of the Securities Exchange Act, 15 U.S.C. § 78bb(a), which states in pertinent part: "No person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in 1 or more actions, a total amount in excess of the actual damages to that person account of the act complained of...." This language has long been interpreted to mean "out-of-pocket" losses, *Zeller v. Bogue Elec. Mfg.*

*Corp.*, 476 F.2d 795, 801-802 (2d Cir.)(Friendly, J.), *cert. denied*, 414 U.S. 908 (1973); *Levine v. Seilon*, 439 F.2d 328, 334 (2d Cir. 1971)(Friendly, J.).

20.  More than a preponderance of the evidence at trial established the economic loss element of the 10b-5 cause of action.  Plaintiff Delio Filho was damaged in out-of-pocket loss flowing from Defendant Bank's violation of  § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. There are two components of damages.  *First*, as established in Findings 30 and 60 above, the Structured Note transactions resulted in losses shown in the chart contained in Stipulation of Fact No. 14 at $45,718 that resulted in losses to Plaintiff Delio Filho's bank account shown in Stipulation of Fact No. 16 (Stip. Facts 14, 16), before the addition of pre-judgment interest and without consideration of punitive damages.  *Second*, Plaintiff Delio Filho incurred borrowing costs in bank fees and interest from having to borrow 90,000 Reals (approximately $50,000) in 2010 for the real estate purchase in Brazil to make up for the losses in the account at Defendant Bank.

**(6)      The Preponderance Of The Evidence Established**
**The Loss Causation Element Of The 10b-5 Action.**

21.  The sixth element of the private cause of action under § 10(b) of the Securities Exchange Act of 1934 and S.E.C. Rule 10b-5 is "loss causation."  Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2005), *quoting Emergent Capital Inv. Mgmt. LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).

22.  More than a preponderance of the evidence at trial established the "loss causation" element of the 10b-5 cause of action for reasons established in Findings 6, 20 and 23-60 above. The stock that was in Plaintiff Delio Filho's account in May 2010 was there entirely by Defendant Bank's

doing.  Plaintiff Delio Filho had not authorized any of the Structured Note transactions, and indeed, Plaintiff Delio Filho did not know about most of the Structured Note transactions.  The specific Structured Note transactions in June and July 2008 resulting in Plaintiff Delio Filho owning stock (which he did not want to do) were not ones that Plaintiff Delio Filho was told about before their purchase.  One of the features of the Structured Note, as explained by Mr. Geelan, is that the noteholder may end up being forced to own stock that the noteholder would never have invested in (John Geelan, Trial Tr. 177), which is what happened here, as Plaintiff Delio Filho did not intend to invest in stock (Plaintff Delio Filho, Trial Tr. 149).  In June 2010, when the stock was sold, Plaintiff Delio Filho needed the money for the real estate purchase in Brazil for his family, the reason that Plaintiff Delio Filho had from the opening of the account in 2002 said to Bank officer Mr. Naslausky and then repeated again in 2006 to Bank officer Ms. Ferreira.  The fact that Plaintiff Delio Filho gave in late May 2010 the written authorization to sell the stock in his account, which was done in early June 2010, does not absolve the Defendant Bank of liability for the losses caused by Defendant Bank's conduct that had caused the stock to be in Plaintiff Delio Filho's account in the first place from Structured Note purchases that were unauthorized and effected without even Plaintiff Delio Filho's knowledge.

> **C.**    **The *Delshah Group LLC v. Atit Javeri, et al.* Case.**

23.  Because Defendant Bank invoked the case of *Delshah Group LLC v. Atit Javeri, et al.*, 2013 WL 2322488 (S.D.N.Y. May 28, 2013), to argue that Plaintiff Delio Filho is simply trying to undo losing investments (Defendant Bank Opening, Tr. 27), it is instructive to note how that case is diametrically different is Plaintiff Delio Filho's case.

24. In _Delshah Group LLC v. Atit Javeri, et al._, the security was, _S.E.C. v. W.J. Howey_, 328 U.S. 293 (1946), an investment contract in a real estate development project.  Basic elements of the 10b-5 claim were missing:

> • There were no "material misstatements and omissions": the plaintiff Delshah's principal (a top graduate of the Harvard Law School who practiced corporate law at Wachtell Lipton before becoming a real estate businessman) complained about not being told about cost and budget overruns (which happened after the time the plaintiff Delshah bought its interest in March 2007), while admitting receiving a fair amount of information: the _pro forma_ on which the lending banks relied, an independent real estate company's report on marketability of the condo apartments, e-mail responses to questions, a couple of site visits, press articles on the project, and sales data on sold apartments and at what prices.

> • There was no _scienter_: the Zamir defendants provided ample information believed to be accurate, and they believed whole heartedly in the project.

> • There was no "loss causation": even assuming, _arguendo_, that the Zamir defendants did not disclose, in the January to March 2007 period, tentatively projected cost overruns amounting to 1.8% of a $193 million budget and possible slippages in a construction schedule not given to plaintiff Delshah and not based on the schedule in the construction loan agreement, those purported anticipated cost overruns and schedule slippages did not cause plaintiff Delshah's loss of 90% of the value of its security some three years later after the market had crashed and condo apartment buyers wanted out of contracts.

In these circumstances in _Delshah Group LLC v. Atit Javeri, et al._, Plaintiff Delshah was truly attempting to avoid the downside risk of the investment that plaintiff Delshah had consciously and knowledgeably undertaken, as expressly stated in a written Subscription Agreement for the project investors that did not take a top Harvard Law School graduate/Wachtell corporate lawyer to understand.

25. Here, Plaintiff Delio Filho's case was entirely different.  As discussed above, all the elements of the 10b-5 are satisfied, including those missing from the _Delshah Group LLC v. Atit Javeri, et al._ case:

-36-

• Unlike in *Delshah Group LLC v. Atit Javeri, et al.* but in this case, there were "material misstatements and omissions" and a fraudulent course of conduct: Plaintiff Delio Filho's account monies were used for unauthorized transactions in Structured Notes about which Plaintiff Delio Filho did not know most of the time and were unsuitable for him as an average person who was not a wealthy, sophisticated investor; and when what disclosure was made, Plaintiff Delio Filho's funds were put into such high risk Structured Notes without a without a disclosure of the risks  and without the provision of the Term Sheets to Plaintiff Delio Filho.

• Unlike in *Delshah Group LLC v. Atit Javeri, et al.* but in this case, there was *scienter*: Defendant Bank had an opportunity to commit fraud with the way that the account was set up; and what was done by Defendant Bank officer Ms. Ferreira in engaging in the highly risk Structured Note transactions with Plaintiff Delio Filho's account monies without Plaintiff Delio Filho's knowledge most of the time, without adequate disclosure when disclosure was made and without authorization ever carried the risk of fraudulent omission so obvious that Ms. Ferreira and thus the Defendant Bank must have been aware of it.

• Unlike in *Delshah Group LLC v. Atit Javeri, et al.* but in this case, there was "loss causation": the stock that was in Plaintiff Delio Filho's account in May 2010 was there entirely by Defendant Bank's doing -- Plaintiff Delio Filho had not authorized any of the Structured Note purchases and the Structured Note transactions in June and July 2008 resulting in Plaintiff Delio Filho owning stock (which he did not want to do) were not ones that Plaintiff Delio Filho was told about before their purchase; in June 2010, when the stock was sold, Plaintiff Delio Filho needed the money for a real estate purchase in Brazil, the reason that Plaintiff Delio Filho had from the opening of the account told Defendant Bank's officers.

In these circumstances, Defendant Bank's attempt to say that  Plaintiff Delio Filho is trying to undo unprofitable investments is absurdly insensible.  Quite unlike the plaintiff Delshah in *Delshah Group LLC v. Atit Javeri, et al.*, Plaintiff Delio Filho did not decide to purchase Structured Notes after ample disclosure; he never authorized any purchase and did not know about the purchases most all the time; the losses resulted from what Defendant Bank had done.

## II.   **Plaintiff Delio Filho's Breach of Contract Claim.**

26.  Based on the trial record, the Court should enter judgment for Plaintiff Delio Filho on his breach of contract claim.  More than a preponderance of the evidence established that the

elements of a breach of contract claim were satisfied, and contract law precludes Defendant Bank's effort to rely on fine print provisions to escape liability.

### A.      The Elements of Breach of Contract Were Satisfied.

27.   The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach.  *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21-22 (2d Cir. 2011), *citing First Invs. Corp. v. Liberty Mut. Ins. Co.,* 152 F.3d 162, 168 (2d Cir.1998); *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 350-51 (2d Cir. 2005), *citing Marks v. New York University,* 61 F.Supp.2d 81, 88 (S.D.N.Y.1999).  Each of the four elements of breach of contract was satisfied by more than the preponderance of the evidence in the trial record.

### (1)      Existence Of A Contract.

28.   As established in Findings 7 through 15 above, the trial record showed the existence of an agreement in JX 1 between Defendant Bank and its customer Plaintiff Delio Filho, subject to the contract law governing contracts of adhesion discussed below (*see* Conclusions of Law II..B.), containing the bank account opening terms pages, the "International Banking Terms and Conditions" and an "Investment Agreement."  The account opening term pages contain necessary signatures and identification of terms and limitations.  (Stip. Fact 5; JX 1.)

29.   As established in Findings 10 and 13 above, three contract provisions are of particular note.  *First*, as noted above, page SNB-SF 00006 of JX 1 is marked to authorize investment in general accounts, mutual funds, money market, U.S. equities and time deposits; emerging market debt and derivative instruments are not authorized.  (JX 1, SNB-SF 00006.)  *Second*, as noted above,

the "International Banking Terms and Conditions" provides, among other things, in section 31 that "all financial instruments and securities purchased by the Bank for your Investment Account will be selected by you, without recommendation or advice by the Bank." (JX 1, SNB-SF 00016.) *Third*, as noted above, the "International Banking Terms and Conditions," also provides, among other things, in section 12 that "Notwithstanding the foregoing, you understand that United States law requires that certain materials in connection with securities you hold in an Account be forwarded to you regardless of any hold mail arrangement." (JX 1, SNB-SF 00012; Peter Javier, Trial Tr. 224-225.)

> **(2)    Performance By The Party Seeking Recovery (Plaintiff Delio Filho).**

30.  As established in Finding 17 above, the trial record showed that Plaintiff Delio Filho, as the bank customer, performed by putting the 160,000 Euros into the bank account opened after meeting with Bank Officer Mr. Naslausky.  (Stip. Facts 6-7; Plaintiff Delio Filho, Trial Tr. 40-41; JX 1.)

> **(3)    Non-Performance By The Other Party (Defendant Bank).**

31.  As established by Findings 22-53 above, Defendant Bank, while Ms. Ferreira was the account officer, did not abide by the contract in a number of ways.  *First*, as established in Findings 22-53, Ms. Ferreira invested Plaintiff Delio Filho's account monies in high risk Structured Notes that were clearly not authorized by the contract.  The "Investment Profile" authorized investment in general accounts, mutual funds, money market, U.S. equities and time deposits -- emerging market debt and derivative instruments were not authorized.  (JX 1, SNB-SF 00006.) *Second*, as established by Findings 22-53 above, Ms. Ferreira invested Plaintiff Delio Filho's account monies in Structured Notes that was done by Ms. Ferreira without Plaintiff Delio Filho even knowing about it, much less

-39-

by Plaintiff Delio Filho's selection and authorization.  The contract provided that "all financial instruments and securities purchased by the Bank for your Investment Account will be selected by you, without recommendation or advice by the Bank." (JX 1, SNB-SF 00016.) *Third*, as established by Findings 22-53 above, when there was disclosure, Ms. Ferreira invested Plaintiff Delio Filho's account monies in Structured Notes that was done without proper disclosure such as Term Sheets. According to the contract, "United States law requires that certain materials in connection with securities you hold in an Account be forwarded to you regardless of any hold mail arrangement." (JX 1, SNB-SF 00012.)

### (4)   Damages Attributable To The Breach Of Contract.

32.  As established in Findings 30 and 60 above, the Structured Note transactions resulted in losses to Plaintiff Delio Filho's bank account.  (Stip. Facts 14, 16.)  Plaintiff Delio Filho was damaged by Defendant Bank's breach of contract.

33.  Damages for breach of contract ordinarily involves the court protecting the expectation of the injured party (here, Plaintiff Delio Filho) by giving the injured party the "benefit of the bargain." E.A. Farnsworth, *Contracts*, § 12.1, p. 730 (4th ed. 2004).  The "benefit of the bargain" is the value of the contract that the contract would have had, had it been performed. E.A. Farnsworth, *Contracts*, § 12.1, p. 730 (4th ed. 2004).  *Accord*, Second Restatement of Contracts § 344.

34.  A calculation of "expectation damages" for breach of contract would show damages in the amount of $90,722 before the addition of pre-judgment interest.  Assuming that the account monies were invested instead in certificates of deposit bearing interest rates from the Board of Governors of the Federal Reserve System and factoring in the $9,500 in withdrawals from October 2003 to January 2005, the amount in Plaintiff Delio Filho's account in June 2010 would have been

$185,661, up from the $150,500; that differential is $34,161, which added to the loss in the account shown in JX 6 of $55,561 totals $90,722.  Another way of deriving that number is to subtract from $185,661 (the adjusted net deposit money in July 2010), the amount of $94,939 (what remained after the wrongful investments in Structured Notes in 2010 dollars); the number again is $90,722.  This is the amount that would put Plaintiff Delio Filho in the same position in which he would have been but for Defendant Bank's breach.  (Stip. Fact 6; JX 6; PX 2; Trial Tr. 27.)

**B.      Defendant Bank's Attempt To Invoke Fine Print Contractual Language To Absolve Itself Of Liability Is Unavailing.**

35.   The "International Banking Terms and Conditions document" is unquestionably a standardized contract form, often times called a contract of adhesion, because a customer essentially has to take it or leave it without a realistic opportunity to bargain.  *Sears Roebuck and Co. v. Avery*, 593 S.E.2d 424, 430 (N.C. Ct. App. 2004); *Broemmer v. Abortion Servs. of Phoenix, Ltd.*, 173 Ariz. 148, 150, 840 P.2d 1013, 1015 (Ariz. S.Ct.  1992); *Godfrey v. Eastman Kodak Co.*, 1991 WL 64463 *3-4 (S.D.N.Y. 1991); *Wheeler v. St. Joseph Hosp.*, 63 Cal.App.3d 345, 356, 133 Cal. Rptr. 775, 783 (1976); E.A. Farnsworth, *Contracts*, § 4.26, pp. 285-294 (4th ed. 2004).

36.   As established in Findings 8 and 12 above, the record in this case clearly corresponds to that description of a contract of adhesion.  When the account was opened, Defendant Bank officer Mr. Naslausky had Plaintiff Delio Filho sign an "Acknowledgment" that had Plaintiff Delio Filho agreeing to the"International Banking Terms and Conditions" that he was in fact not shown and not given at the time.  Plaintiff Delio Filho recognized he had to accept the"International Banking Terms and Conditions" as is.  (Plaintiff Delio Filho, Trial Tr. 37-38, 77, 81-83.)  Aptly, comment b to § 211 of the Second Restatement of Contracts states: "Customers do not in fact ordinarily understand or

even read the standard terms.  They trust to the god faith of the party using the form and to the tacit

representation that like terms are being accepted regularly by others similarly situated."

37.  It is recognized in the Second Restatement of Contracts and by the courts that the

enforceability of a contract of adhesion is especially affected by three legal doctrines: (i) the

reasonable expectation of the adhering party; (ii) the overriding obligation of good faith and fair

dealing; and (iii) the unconscionability doctrine.  Second Restatement of Contracts, § 211 and

comments; _Sears Roebuck and Co. v. Avery_, 593 S.E.2d 424, 430-431 (N.C. Ct. App. 2004); _Darner_

_Motor Sales, Inc. v. Universal Underwriters Ins. Co._, 140 Ariz. 383, 392, 682 P.2d 388, 397 (Ariz.

S.Ct. 1984); _Broemmer v. Abortion Servs. of Phoenix, Ltd._, 173 Ariz. 148, 151-152, 840 P.2d 1013,

1016-1017 (Ariz. S.Ct.  1992); _Graham v. Scissor-Tail, Inc._, 28 Cal.3d 807, 820, 171 Cal. Rptr. 604,

612, 623 P.2d 165, 172-173 (1981).

38.  It follows that these legal doctrines do not permit for the kind of literal reading of the

"International Banking Terms and Conditions" and "Investment Agreement" documents in this case

as done in this case by Defendant Bank as the basis for interpretation.  _See_, _e.g._, _Follman v. World_

_Financial Network National Bank_, 721 F.Supp.2d 158 (E.D.N.Y. 2010).  Also, it follows that any

attempt to limit federal securities fraud, contract, fiduciary duty and common law fraud liability

based on fine print in the "International Banking Terms and Conditions" and "Investment

Agreement" would be unconscionable in the law of contracts of adhesion: "A contract or clause is

unconscionable where there is an 'absence of meaningful choice on the part of one of the parties

together with contract terms which are unreasonably favorable to the other party'." _Desiderio v._

_National Ass'n of Sec. Dealers_, 191 F.3d 19, 207 (2d Cir. 1999), _cert. denied_, 531 U.S.  1069 (2001),

_quoting_ 8 Samuel Williston, _A Treatise on the Law of Contracts_ § 18.9, at 54 (4th ed. 1998); _Brennan_

*v. Bally Total Fitness*, 153 F.Supp.2d 408, 416 (S.D.N.Y. 2001); *Rush v. Oppenheimer & Co.*, 638 F.Supp. 872, 875 (S.D.N.Y. 1996).  On example is a provision that states the customer cannot rely on the bank for information (Peter Javier, Trial Tr. 212); such a provision would license a bank to engage in wholly irresponsible behavior in violation of federal and state law.

### III.   Plaintiff Delio Filho's Breach of Fiduciary Duty Claim.

39.   Based on the trial record, the Court should enter judgment for Plaintiff Delio Filho on his claim for breach of fiduciary duty by Defendant Bank.  Under the circumstances of this case, the law that recognizes that a fiduciary duty may arise between a bank and its customer is amply satisfied, and more than a preponderance of the evidence established that Defendant Bank's sale of high risk securities to an unsophisticated investor without disclosure of the risks breached its fiduciary duties owed to Plaintiff Delio Filho.

### A.   Under The Law and Given The Facts of This Case, The Defendant Bank Owed A Fiduciary Duty To Plaintiff Delio Filho.

40.   It is recognized in the case law that notwithstanding any general rule otherwise, circumstances may give rise to a bank having a fiduciary duty to a bank customer.  In *ADT Operations, Inc. v. Chase Manhattan Bank, N.A.*, 173 Misc.2d 959, 963, 662 N.Y.S.2d 190 (Sup.Ct. N.Y. Co. 1997), the Court noted that while "the New York courts have generally held that the legal relationship between a customer and a bank is an arm's length, debtor/creditor relationship which does not, without more, create a fiduciary relationship," "[a] fiduciary relationship may arise between a bank and its customer where the bank assumes control and responsibility over the customer's assets and operations, or where the customer places special trust and confidence in the bank and thereby becomes dependent upon it," *citing Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 318

(2d Cir. 1993), *P. Chimento, Inc. v. Banco Popular de Puerto Rico*, 208 A.D.2d 385, 386, 617 N.Y.S.2d 1757 (1ˢᵗ Dep't 1994) and *Scott v. Dime Savings Bank of New York*, 886 F.Supp. 1073 (S.D.N.Y. 1995). Also, in *Frydman & Company, et al. v. Credit Suisse First Boston Corp.*, 272 A.D.2d 236, 237, 708 N.Y.S.2d 77 (1ˢᵗ Dep't 2000), and *Weiner v. Lazard Freres & Co.*, 241 A.D.2d 114, 122, 672 N.Y.S.2d 8 (1ˢᵗ Dep't 1998), it was stated that a court will look to "the ongoing conduct between the parties" to determine whether a fiduciary relationships exists.

41. The facts of this case fit exactly the situation that these cases recognize when a bank assumes control and responsibility over the customer's assets and operations and where a customer places special trust and confidence in the bank and becomes dependent upon it. As established by Findings 5-6, 8, 11-12, 20, 23, 26 and 29-53 above, the circumstances in this case establishing a fiduciary relationship according to the case law included, but were not limited to: (i) the filling out of forms in English for Plaintiff Delio Filho given Plaintiff Delio Filho's limited knowledge of English; (ii) Plaintiff Delio Filho's need expressed to Defendant Bank officers Mr. Naslausky and Ms. Ferreira to protect the monies being placed in account with Defendant Bank for a real estate purchase in Brazil; (iii) the oral guarantee given by Defendant Bank office Ms. Ferreira to Plaintiff Delio Filho that the principal was protected; (iv) the trust imposed by Plaintiff Delio Filho in Defendant Bank; (v) Plaintiff Delio Filho's lack of knowledge and experience in securities and corresponding inability to evaluate the Structured Notes presented by Defendant Bank officer Ms. Ferreira; (vi) the sending of statements and other documents to "hold mail" instead of to Plaintiff Delio Filho; and (vii) the trading that Defendant Bank officer Ms. Ferreira did in Plaintiff Delio Filho's account monies in highly risky Structured Notes without, for the most part, even telling Plaintiff Delio Filho and without authorization. Mr. Javier's highly general statement of

-44-

"understanding" for Defendant Bank denying a fiduciary relationship (Peter Javier, Trial Tr. 206-207) certainly does not negate the application of case law to the particular facts of this case establishing a fiduciary relationship.

42.  Further, 15 U.S.C. § 78c(4)(D) and 12 C.F.R. § 9.2(e) both treat a bank as acting in a "fiduciary capacity" when acting with "investment discretion." "Investment discretion" is defined in 12 C.F.R. § 9.2(i) as when authority exists to determine what securities to buy or sell in the account.  Mr. Javier denied that Defendant Bank had discretionary accounts (Peter Javier, Trial Tr. 209); but as established in paragraphs 30-44 above, what Defendant Bank officer Ms. Ferreira actually did with Plaintiff Delio Filho's account monies was to operate as if it were a discretionary account.

**B.     The Defendant Bank Breached Its Fiduciary Duties To Plaintiff Delio Filho.**

43.  As established in Findings 22-53 above, Defendant Bank breached its fiduciary duties of care and loyalty by, among other things, originating the Structured Note investments and putting Plaintiff Delio Filho's funds into highly risky Structured Notes, unsuitable for an average person in Plaintiff Delo Filho's position, without his authorization, without his knowledge in most instances and without a proper disclosure of risks even when some disclosure was made.

**C.     Damages Attributable To The Breach Of Fiduciary Duty.**

44.  Plaintiff Delio Filho was damaged by Defendant Bank's breach of fiduciary duty. As with the 10b-5 claim, there are two components of damages. *First*, as established in Findings 30 and 60 above, the Structured Note transactions resulted in losses shown in the chart contained in the parties' Stipulation of Fact No. 14 in the amount of $45,718 that resulted in losses to Plaintiff Delio Filho's bank  account shown in Stipulation of Fact No. 16 (Stip. Facts 14, 16), before the addition

-45-

of pre-judgment interest and without consideration of punitive damages.  *Second*, Plaintiff Delio

Filho incurred borrowing costs in bank fees and interest from having to borrow 90,000 Reais

(approximately $50,000) in 2010 for the real estate purchase in Brazil to make up for the losses in

the account at Defendant Bank.

### IV.    Plaintiff Delio Filho's Common Law Fraud Claim.

45.    Based on the trial record, the Court should enter judgment for Plaintiff Delio Filho on

his claim for common law fraud.  The clear and convincing evidence established that the elements

of common law fraud were satisfied.  *Gaidon v. Guardian Life Insurance*, 94 N.Y.2d 330, 725

N.E.2d 598, 704 N.Y.S.2d 177 (1999) (burden of proof).

46.    Similar to Rule 10b-5 cases, common law fraud involves elements of material

misrepresentation or omission, *scienter*, causation and damages.  *Banque Arabe Et Internationale*

*D'Investissement v. Maryland National*, 57 F.3d 146, 153 (2d Cir. 1995).  As discussed in

Conclusion 40-42 above, Defendant Bank owed a fiduciary duty to Plaintiff Delio Filho; and thus,

there was a duty to speak and material omissions are actionable as fraud under state law.  *Brass v.*

*American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Allen v. WestPoint-Pepperell,*

*Inc.*, 945 F.2d 40, 44 (2d Cir. 1991).  As established in Findings 22-53 and 60 above, Defendant

Bank engaged in a fraudulent course of conduct involving material omissions that was done with

*scienter* and caused damage to Plaintiff Delio Filho.

47.    As with the 10b-5 claim and breach of fiduciary duty claims, there are two components

of damages resulting from Defendant Bank's common law fraud.  *First*, as established in Findings

30 and 60 above, the Structured Note transactions resulted in losses shown in the chart contained in

Stipulation of Fact No. 14 in the amount of $45,718 that resulted in losses to Plaintiff Delio Filho's

bank  account shown in Stipulation of Fact No. 16 (Stip. Facts 14, 16), before the addition of pre-judgment interest and without consideration of punitive damages.  *Second*, Plaintiff Delio Filho incurred  borrowing  costs  in  bank  fees  and  interest  from  having  to  borrow  90,000  Reals (approximately $50,000) in 2010 for the real estate purchase in Brazil to make up for the losses in the account at Defendant Bank.

**V.      Punitive Damages For The 10b-5, Breach of Fiduciary
          Duty and Common Law Fruad Claims.**

48.  For Plaintiff Delio Filho's 10b-5, breach of fiduciary duty and common law fraud claims, punitive damages should be awarded to Plaintiff Delio Filho.  Society has an interest in deterring banks from engaging in the willful, deliberate, highly reckless conduct that occurred in this case. As established in Findings 22-53, Defendant Bank originated the Structured Note transactions and put Plaintiff Delio Filho's funds into highly risky Structured Notes, unsuitable for an average person in Plaintiff Delio Delio, without Plaintiff Delio Filho's authorization, without Plaintiff Delio Filho's knowledge in most instances and without a proper disclosure of risks even when some disclosure was made.  As established in Findings 54-55 above, when it became apparent that Defendant Bank's actions had caused losses, Defendant Bank from the start still denied error; this was willful, wanton behavior.

## CONCLUSION

For the reasons stated above, the Court should, based on the trial record, enter Judgment for Plaintiff Delio for  violation of § 10(b) of the Securities Exchange Act of 1934 and S.E.C. Rule 10b-5 and promulgated thereunder and award damages in the amount of $50,000 before pre-Judgment interest, breach of contract and award damages in the amount of $90,722 before pre-Judgment

interest, breach of fiduciary duty and award damages in the amount of $50,000 before pre-Judgment

interest, and common law fraud and award damages in the amount of $50,000 before pre-Judgment

interest and further should grant such other and further relief as the Court deems just and proper,

including the award of punitive damages in an amount of the Court's discretion for willful, wanton

behavior that was in breach of fiduciary duty, violation of § 10(b) of the Securities Exchange Act

of 1934 and S.E.C. Rule 10b-5 and promulgated thereunder and common law fraud.

**Dated:  New York, New York**
   **September 3, 2013**     **NESENOFF & MILTENBERG, LLP**

        **By: _____*Philip A. Byler, Esq.*_____**
         **Philip A. Byler, Esq.**
         **Andrew T. Miltenberg, Esq.**
         **Marco Santori, Esq.**

         **Attorneys for Plaintiff Delio Alosisio**
         **Mattos Santos Filho**
         **363 Seventh Avenue - 5th Floor**
         **New York, New York 10001**
         **212.736.4500**