USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Mar. 11, 2014

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------X

DELIO ALOISIO MATTOS SANTOS FILHO,   :

          :

          Plaintiff,   :    No. 10 Civ. 7508 (JFK)

          :

   -against-        :    **FINDINGS OF FACT**

          :   **and CONCLUSIONS OF LAW**

SAFRA NATIONAL BANK OF NEW YORK,   :

          :

          Defendant.   :

-------------------------------X

Appearances

For Plaintiff Delio Aloisio Mattos Santos Filho
    NESENOFF & MILTENBERG, LLP
    By:  Philip A. Byler

For Defendant Safra National Bank Of New York
    THE BARRY FISCHER LAW FIRM, LLC
    By:  Barry R. Fischer
        Eric S. Waldman

**JOHN F. KEENAN, United States District Judge:**

This is a dispute arising out of Plaintiff Delio Aloisio

Mattos Santos Filho's banking relationship with Safra National

Bank of New York ("Safra").  Plaintiff, a Brazilian citizen,

opened an account with Safra and deposited monies that he

planned to use for the eventual purchase of real estate.  He

alleges that Safra employee Camilla Ferreira invested his money

in risky financial products without his authorization.

Plaintiff is presently pursuing claims of (1) securities fraud

under Rule 10b-5; (2) breach of contract; (3) breach of

fiduciary duty; and (4) common law fraud.  He seeks damages up to $90,722 plus interest, as well as punitive damages.

The matter was tried to the Bench on July 29 and 30, 2013.[1] The Court heard testimony from Plaintiff and from his expert witness, John Geelan, as well as from Peter Javier, Safra's chief compliance officer.  The Court also heard summations on September 18, 2013.  This Order constitutes the Court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

## I.  Findings of Fact

The Court makes the following findings of facts after a thorough review of (1) the Joint Pretrial Order submitted by the parties on July 15, 2013 (the "JPO"); (2) the evidence at trial, including the Court's assessment of the credibility of the witnesses and the reasonable inferences to be drawn therefrom; and (3) counsels' submissions and arguments.

---

[1] This Court previously granted Safra's motion to compel arbitration, on the grounds that Safra validly added an arbitration provision in a 2005 amendment to the account opening agreements.  The Second Circuit vacated and remanded after determining that there was insufficient evidence in the record to find that Safra had properly amended the contract.  See Filho v. Safra Nat'l Bank of New York, 489 F. App'x 483 (2d Cir. 2012) (summary order).  On remand, the parties agreed to try the matter on the basis of the original agreements, rather than the disputed amended agreement, and Safra further consented to the jurisdiction of this Court. (Trial Tr. at 2–3.)  Thus, the issues discussed in the Circuit's order were moot by the time the bench trial began.

### A.  The Timeline of Undisputed Facts

### 1.  Plaintiff Opens an Account with Safra

Plaintiff Delio Alosio Mattos Santos Filho is a Brazilian citizen.  He is a law school graduate and practices civil law in Brazil. (JPO ¶ 1.)  His first language is Portuguese, although he understands some English. (Trial Tr. at 68.)  At all times relevant to this trial, Plaintiff was not an experienced investor and did not have a specialized understanding of complex financial instruments.  He was aware, however, that stocks are not guaranteed investments and can yield either gains or losses. (Id. at 70.)

Defendant Safra National Bank of New York is a privately owned, nationally chartered bank with its principal place of business in New York. (JPO ¶ 2.)  Safra is a custodial bank and a private bank, but is not a retail bank, a registered broker-dealer, or a registered investment advisor. (Trial Tr. at 208–09, 213.)

On or about July 1, 2002, Plaintiff met with Carlos Naslausky, a Safra account officer, at Plaintiff's father's office in Rio de Janiero. (JPO ¶ 3.)  At that time, Plaintiff was interested in opening a bank account to deposit money that he planned to use eventually for purchasing property.  The property he desired was the subject of ongoing litigation and could not be purchased immediately.  At their meeting, Plaintiff

and Naslausky discussed the possibility of opening an account at Safra. (Trial Tr. at 33–36, 89.)

On or about July 29, 2002, Plaintiff and Naslausky met again at Plaintiff's father's office.  At this meeting, Plaintiff agreed to open an account at Safra.  The following documents, all written in English, were prepared in connection with the account opening:  International Application/Customer Profile, Know Your Customer Profile, Investment Profile, Special Services Agreement, Account Opening Declaration, International Banking Facility, Acknowledgement, International Banking Terms and Conditions (the "IBTC"), and Investment Agreement. (JPO ¶ 5.)

In the account opening documents signed by Plaintiff, his mailing address is listed as "Hold Mail." (Joint Ex. 1 at 2.) Additionally, under "Special Services," the "Hold Mail" box is checked. (Id. at 6.)  That section notes that the "Hold Mail" service is governed by the provisions of the IBTC.

The IBTC sets forth standard terms that govern the responsibilities of the parties, including the following relevant sections:

   o A "hold mail" provision, which states that Safra will
      hold all of the customer's statements and account
      information at the bank for pickup and review by the
      customer.  Under the IBTC, held mail is "deemed to have

been delivered to you on the date which appears on the correspondence . . . and shall be effective notwithstanding your lack of knowledge of the contents of such correspondence." (Joint Ex. 1 at 12.)

o A section stating that the customer agrees to "exercise reasonable care and promptness" in reviewing account statements and to notify Safra in writing regarding any irregularities or unauthorized activity within thirty days of the statement date, even if the statement is being held by Safra for the customer. This section further states that in the absence of such notice or of "manifest error," the bank statements are "conclusive evidence" of the transactions. If notice is not given, the customer will be "fully precluded" from raising any claim arising out of transactions that are reflected in the statements, and will bear any losses. (Id.)

o A provision permitting the bank to accept telephone and oral instructions from the customer. (Id. at 15.)

o An investment services provision, which includes the following disclaimer in bold-face type:

• You understand and agree that all financial instruments and securities purchased by the Bank for your Investment Account will be selected by you, without recommendation or advice by the Bank and are in no way the obligation of or guaranteed by the Bank and that you alone bear any risk of loss . . . . You understand that investing in securities and other

5

> financial instruments involves risks that may affect
> the value of your investments and result in losses to
> you, including the potential loss of the principal
> amount invested.

(<u>Id.</u> at 16–17.)

Unlike the IBTC, the Investment Agreement signed by Plaintiff references the customer in the first person ("we") and the bank as the second person ("you"), in relevant part:

o A provision broadly limiting Safra's liability. (Joint Ex. 1 at 26.)

o A clause concerning derivative instruments and foreign currency CDs, which states in relevant part:

> • We may from time to time request that you invest in
> derivative instruments or foreign currency CDs on our
> behalf, including but not limited to options, forwards
> and futures.  In connection with any such investments,
> we acknowledge that these instruments are subject to
> substantial risks, including in some cases the risk of
> losses exceeding the principal amount invested. . . .
> [W]e represent to you that (a) we are sophisticated
> investors who fully understand the nature and terms of
> such instrument and the risks associated with
> investing in it, and (b) we have sufficient financial
> resources to withstand the possible losses associated
> with an investment in such instrument.

(<u>Id.</u>)

o A provision entitled "No Reliance on Information or Advice Provided," in which the customer indemnifies the bank for any investment advice given by a bank representative. (<u>Id.</u>)

o A statement that the customer(s) are each an "'accredited investor', as such term is defined in Rule 501(a) of

6

Regulation D under the Securities Act of 1933, and we have such knowledge and experience in financial and business matters that we are capable of evaluating the merits and risks of transactions entered into pursuant to this Agreement." (<u>Id.</u> at 27.)

o A provision that where the Investment Agreement and the IBTC conflict, the Investment Agreement controls. (<u>Id.</u>)

o A "No Guarantee" clause, printed in all capital letters on the signature page, whereby the customer(s) acknowledge that investments are not guaranteed or insured, and may lose principal. (<u>Id.</u> at 28.)

o An integration clause that states that the agreements between the customer and Safra "may not be amended or terminated except in writing." (<u>Id.</u>)

Plaintiff signed the Investment Agreement and an acknowledgment of the terms of the IBTC. (JPO ¶ 10.) Despite signing the acknowledgment that he understood and agreed to the IBTC terms, Plaintiff did not actually read the acknowledgment because he believed that its terms were non-negotiable. (Trial Tr. at 77.)

On or about August 1, 2002, Safra's compliance department approved Plaintiff's account. (JPO ¶ 6.) In accordance with the "hold mail" provision in the IBTC, Safra did not mail Plaintiff his account statements during the time his account was open.

7

Rather, Safra held the statements for Plaintiff.  It is not disputed that Safra offered internet banking services, which would have allowed Plaintiff to access and review his account online had he availed himself of these services. (Trial Tr. at 216–17.)

On December 4, 2002, Plaintiff transferred 160,000 Euros into his account.  That same day, Plaintiff gave Naslausky written authorization to convert the Euros into U.S. Dollars at a ratio of 1:1. (JPO ¶ 7.)  On or about December 9, 2002, $157,046.17 from Plaintiff's account was placed in a certificate of deposit ("CD").  The CD originally bore interest at a rate of 0.6 percent, although that rate increased to 0.75 percent in September 2004.  The CD fully matured in September 2006. (Id. ¶¶ 8, 10.)  Plaintiff did not authorize the investment of his money into the CD, but was aware of it and did not object. (Trial Tr. at 86–87.)

## 2.  Ferreira Begins to Invest

In October or November of 2006, after his CD had matured, Plaintiff called Safra to get an update on his account.  He was told that Naslausky no longer worked at the bank and that his new account officer was Carmela Ferreira. (Trial Tr. at 42–43.) Plaintiff indicated to Ferreira that he was displeased that the account was generating fees but no interest. (Id. at 93–94.)

Ferreira sent an email[2] to Plaintiff on December 13, 2006.
(Joint Ex. 5 at 124.)  In the email, she identified several
investment options as potentially responsive to his desire for a
greater rate of return.  These included General Electric
commercial paper, a National Steel S.A. fixed income security,
and a structured note that was based on shares in three
companies:  Gerdau, Vale do rio Doce, and Banco Bradesco. (Id.
at 124.)  Plaintiff replied to her email on the same day.  He
wrote, in relevant part, "Thank you for sending the information.
I will examine it carefully." (Id. at 123.)

The next email that appears in the record was sent by
Ferreira to Plaintiff on December 29, 2006.  It appears to be a
response to an inquiry by Plaintiff, although no such inquiry
appears in the record.  Ferreira wrote, in relevant part,
"Unfortunately today the market did not operate, and on Monday
and Tuesday it will also be closed, so we will effect the
purchase of the Commercial Paper on Wednesday, January 3.  After
the purchase, I will send you an email with the details.  Price,
term, return. . . ." (Id. at 122.)  On January 9, 2007,
Plaintiff followed up by asking, "Camilla, Any news about the
placements?" (Id.)  Ferreira replied that the investment had

---

[2] All of the emails between Plaintiff and Ferreira were composed in
Portuguese.  These emails have been professionally translated into
English for the purposes of this litigation.

been delayed by market forces, but that another investment would be forthcoming. (Id. at 121.) Plaintiff wrote back, "I am waiting for the information regarding the placement you recommended." (Id.) No investments were made from Plaintiff's account during the month of January 2007. (Joint Ex. 3 at 183–85.)

The next relevant email that appears in the record was sent by Ferreira to Plaintiff on March 7, 2007. She advised that an American Express commercial paper product yielded a return of $439.50. (Joint Ex. 5 at 118–19.) This product is reflected in the account statement for February 2007, which notes that an American Express commercial paper product was purchased for $134,560.50. (Joint Ex. 3 at 187.) Ferreira's email on March 7, 2007 also described another possible investment, a structured note involving Vale do Rio Doce. Ferreira explained the mechanics of the structured note. At the end of ninety days, Plaintiff would receive either the principal plus interest, or, if the Vale do Rio Doce share price had decreased more than 20 percent, he would receive his principal investment in shares plus interest in cash. She concluded: "LET'S DO IT??" (Joint Ex. 5 at 118–19.)

It does not appear from the record that Plaintiff directly answered Ferreira's question. However, on March 21, 2007, he wrote to her with a question of his own: "Dear Camilla, How are

our investments?" (Id. at 118.)  Ferreira replied that his investments had been allocated to two structured notes, the aforementioned Vale do Rio Doce note and a second mixed note. She concluded, "Any doubt, let me know." (Id. at 116-17.) Plaintiff did not respond to this email, and his March 2007 statement confirms the purchase of these two notes.  On March 2, a "RIO 12.0%" structured note issued by Lehman Brothers was purchased for $100,000.  On March 12, a "GGB/SID/UBB 16.0%" structured note issued by Lehman Brothers was purchased for $50,000. (Joint Ex. 3 at 192.)  When these notes matured in June 2007, together they yielded a $5,000 gain for Plaintiff. (JPO ¶ 14.)

Between July 2007 and April 2008, six more structured notes were purchased in the account, yielding additional gains of more than $25,000. (Id.)  Plaintiff and Ferreira communicated only sporadically during this period.

### 3.   The Losing Deals

Beginning in June 2008, Ferreira initiated three transactions on Plaintiff's behalf that ultimately lost money, resulting in the damages alleged in this litigation.  The first of these was a structured note purchased for $50,000 on June 9, 2008.  The note had a maturity date of September 15, 2008.  On that date, Plaintiff's account was not credited with the principal investment plus interest, as had occurred in the past.

Because the underlying Rio do Vale Doce stock had lost value, Plaintiff's account instead received 1,350 Rio shares, as well as $1,645.00 in interest. (Joint Ex. 3 at 257, 272-73.)

The second relevant transaction was a structured note purchased for $60,000 on July 22, 2008. (JPO ¶ 14.)  The note matured one year later, on July 29, 2009.  On that date, Plaintiff's account was credited with 600 shares of Agrium, Inc. stock. (Joint Ex. 3 at 325.)

The third relevant transaction was a structured note purchased for $60,000 on July 31, 2008. (JPO ¶ 14.)  The note matured on February 2, 2009.  On February 4, 2009, Plaintiff's account was credited with 420 Mosaic shares plus interest. (Joint Ex. 3 at 298-99.)

It is undisputed that Plaintiff never gave written authorization to Ferreira to enter into these three transactions.  But Plaintiff was later made aware of all three, because they were set forth in an email from Ferreira to Plaintiff dated October 6, 2008.[3]  The email advised that since September 2006, "investment has been done in Structured Notes." (Joint Ex. 4 at 611.)  The message went on to list the three

---

[3] In his proposed findings of fact, Plaintiff concedes that Ferreira advised him of the July 22 and July 31 notes, but states that he was never informed of the June 9 "Rio" note. (Pl. Proposed Findings of Fact ¶¶ 39, 40, 42.)  Plaintiff is mistaken.  Ferreira's October 6 email plainly references the Rio investment. (Joint Ex. 4 at 611.)

transactions which ultimately lost money. Two of these had not yet matured; for those, the email listed the invested amount, the composition of the structured note, a brief explanation of the companies involved, and the maturity date for the notes. For the first transaction, which had already matured, Ferreira noted the amount of the original investment and the name of the company involved, Vale do Rio Doce. Notably, the account summary concluded with Plaintiff's checking account balance, which as of that date was only $12,760.45. (Id.) Plaintiff received this email, and acknowledged at trial that he did not respond to Ferreira with any questions about his investments or any objections to the transactions. (Trial Tr. at 126–27.)

### 4. The Breakdown Between the Parties

In July 2009, Plaintiff called Safra with a view toward using his money in connection with the long-contemplated purchase of real estate. He was informed that Ferreira no longer worked at Safra and that his new account officer was Marco Amorim. (Trial Tr. at 59.) Amorim told Plaintiff his account balance, which in July 2009 was about $90,000 in cash and stock. (Joint Ex. 3 at 322.) Plaintiff testified that he was surprised to learn of his balance, although he could not remember whether he told Amorim that Ferreira had guaranteed the principal of his investments. (Trial Tr. at 128.)

On August 14, 2009, Amorim sent an email to Plaintiff.  He
stated that Safra had not identified any messages from Ferreira
that mentioned a guarantee of principal.  Amorim also proposed
favorable financing conditions as a "good faith business
gesture." (Joint Ex. 4 at 612–13.)  On September 9, 2009,
Plaintiff emailed Amorim and requested copies of his account
opening documents as well as the documents that had accumulated
in his held mail.  He also instructed Amorim that he was not
"authorizing any further activity without [his] prior written
consent." (Joint Ex. 5 at 106.)  Safra forwarded him the held
mail, which contained his monthly account statements as well as
trade confirmations and term sheets for the structured note
purchases. (Joint Ex. 3; Def. Ex. A; Trial Tr. at 132–33.)

In an email sent on May 26, 2010, Plaintiff directed Safra
to sell the remaining equities in his account, which Safra did
on June 1, 2010.  These equities, which Plaintiff had received
from the three structured notes discussed above, were sold at a
loss.  The Rio do Vale Doce shares were sold for $34,181.42; the
Agrium shares were sold for $31,807.46; and the Mosaic shares
were sold for $18,774.68. (JPO ¶ 15.)

In sum, Ferreira's entire course of structured note
purchases in 2007 and 2008 caused Plaintiff to lose $45,718.60.
(JPO ¶ 14.)

### B.  Other Witnesses

Aside from Plaintiff, the Court heard from two other witnesses, John Geelan and Peter Javier.

### 1.  John Geelan

Plaintiff called John Geelan as an expert witness.  Geelan spent most of his career at Goodbody & Company and then at Merrill Lynch, and has experience with customer accounts and with various financial products. (Trial Tr. 155-162.)  Geelan's testimony consisted mainly of opining about structured products like the ones involved in this case.  He testified that a structured note is a complex and risky instrument, because it carries the possibility that the customer will receive stock instead of cash proceeds. (Id. at 176-77.)  He further testified that the high interest rate offered on structured notes confirms their risk. (Id. at 178.)

With respect to the instant litigation, Geelan testified that the risk involved with structured transactions makes them unsuitable for average, unsophisticated investors like Plaintiff. (Id. at 186.)  He also opined that Ferreira's explanation of the process by which Plaintiff would receive his return on the structured notes was inadequate. (Id. at 184, 187-88.)

The Court notes that Geelan's expertise in these matters was limited.  He did not have a comprehensive understanding of

the regulatory regime governing Safra, and in fact candidly admitted to not having "spent much time in the banking area." (Id. at 175.)  The Court nevertheless credits his testimony on one limited point, which to Geelan was fundamental:  the structured note products involved in this case were not appropriate for Plaintiff.  They are securities for "sophisticated investors." (Id. at 186–87.)

### 2.  Peter Javier

Peter Javier is Safra's chief compliance officer, and he is responsible for regulatory issues concerning the bank. (Id. at 201–03.)  Javier gave an overview of the regulations under which Safra operates.  He testified that Safra is a custodial bank and a private bank, but is not a retail bank, a registered broker-dealer, or a registered investment advisor. (Id. at 208–09, 213.)  He further testified that Safra does not offer, and is not permitted to offer, discretionary account services wherein the institution is given authority to invest on behalf of the client. (Id. at 209–10.)

Javier explained that Safra's foreign customers often have "hold mail" accounts where account statements and correspondence relating to the account are held at the bank. (Id. at 214.) These customers commonly choose to utilize the hold mail service for security reasons.  They may visit the Safra office to review these documents, or they may direct the bank to send the

documents, for example by fax or email. (<u>Id.</u> at 214–15.) Javier also confirmed that during all times relevant to this litigation, Safra offered online banking services that would have allowed Plaintiff to review his account statements and transactions, but that there was no record that he had utilized these services. (<u>Id.</u> at 216–17.)

### C.  The Court's Findings as to Disputed Facts

#### 1.  Plaintiff Did Not Authorize Ferreira to Enter into the Transactions

A central factual dispute in the case is whether Plaintiff authorized Ferreira to enter into complex transactions on his behalf.  Before the trial, Safra took the position that Plaintiff had given Ferreira oral permission to make the trades over the telephone. (JPO at 6.)  But at trial, Plaintiff's testimony was unequivocal that he had never authorized the purchase of any securities, either by telephone or email.  This testimony was not discredited by Safra in any meaningful way. Although Ferreira sent several emails advising Plaintiff of transactions, and Plaintiff clearly knew about some of them, there is no evidence that he had first explicitly given Safra authorization to invest his money.  The Court therefore finds that Ferreira was not acting with Plaintiff's authorization when she invested money from his account in the three structured notes that were later sold at a loss.

**2.  Ferreira Did Not Guarantee the Principal to Plaintiff**

In this instance, it is not Safra but Plaintiff who hangs his hat upon an alleged telephone conversation with Ferreira. Throughout this litigation, Plaintiff has maintained that Ferreira orally guaranteed to him that he would not be exposed to the risk of losing principal, i.e., his initial deposit. (Trial Tr. 46, 100–01.)  Safra responds that the evidence in the record does not support Plaintiff's claim.  It also points to language in both the IBTC and the Investment Agreement specifically stating the opposite — that investments are not guaranteed and may lose money, including the principal amount invested.

The Court finds that Ferreira did not guarantee Plaintiff's principal for the following reasons.  First, the record is replete with emails from Ferreira, and none of them suggest a guarantee on principal.  Because of this email record, the guarantee question is fundamentally different from the authorization question discussed above.  Here, there is circumstantial evidence that undermines Plaintiff's claim.

Second, aside from not making any explicit guarantees, Ferreira's emails are inconsistent with such a promise in other ways.  Several of the emails explain investments that contain a contingency where on the maturity date, Plaintiff would either receive his principal plus interest or, if the value of the

18

shares had decreased substantially, his principal would instead be converted to actual shares (presumably for him to hold until their value went up again). See, e.g., Joint Ex. 4 at 606; id. at 609.  Because this investment already contains a hedge against loss, it is incompatible with the notion that Safra would independently guarantee the principal.  There would be no reason for Ferreira to recommend this investment if she was also guaranteeing that Plaintiff would not lose money.  Moreover, on several occasions, Ferreira took time to promote the companies offering securities as "solid companies, without any credit problem." (Id. at 611.)  This information would be of little interest to Plaintiff if she had promised to insulate him from the risk of investing with those companies.

Third, the record contains an email sent by Plaintiff to Ferreira on March 21, 2007, asking "Dear Camilla, How are our investments?" (Joint Ex. 5 at 118.)  This statement indicates Plaintiff understood, at least on a basic level, that his investments would not yield a fixed return.  Rather, he appreciated that their performance was uncertain.  The most compelling inference is that Plaintiff knew that he was exposed to loss, and that is why he wanted an update.  Plaintiff's trial testimony — i.e., that he understood the risks inherent to investing in equities — confirms this inference. (Trial Tr. at 70.)

Finally, Plaintiff's testimony regarding his arrangements with Ferreira was not credible.  It is true that Plaintiff testified several times that Ferreira explicitly guaranteed the principal of his investments. See Trial Tr. at 46 ("She said that any investments that she recommended would be completely guaranteed and that the principal would never be reduced and that the whole amount would be guaranteed."); id. at 100-01 ("[I]t would be 100 percent secure.").  But his purported certainty on this point is in sharp contrast to the vague and equivocal answers he gave to most other questions at trial. See Trial Tr. at 77, 80-81 (Plaintiff testifying that he did not remember where or when he signed his account opening documents); id. at 86 (Plaintiff testifying that he was not sure how his money was invested from 2002 to 2006); id. at 92, 97-99, 121-23, 128, 131 (Plaintiff testifying that he did not remember various aspects of his correspondence with Ferreira and Amorim).  After observing Plaintiff at trial, the Court finds that his unequivocal testimony on the guarantee question was not the product of an intermittently excellent memory, but instead was manufactured to serve his position.  This testimony is also wholly unsupported by the evidentiary record in the case.  The Court declines to credit his testimony and concludes that no such guarantee was made.[4]

---

[4] Safra makes two legal arguments to preclude liability even if

### 3.  Plaintiff Knew and Understood that Ferreira Was Investing His Money

At various times during his testimony, Plaintiff stated that even though Ferreira repeatedly advised him of structured note purchases in his account, he did not understand those purchases to have actually taken place. (Trial Tr. at 102-03, 107-08 ("[A]ll I knew was that she was mentioning [the investments], but I did not know that she had actually realized or actually made those investments.").)  He also offered conflicting testimony as to whether he believed that the investments Ferreira mentioned to him were being made by Safra on a proprietary basis. Compare id. at 102-3 (testifying that he did not believe the structured note purchases were Safra investments), with id. at 109 (his understanding that "she is saying, you know, basically, do you want to join us, she is talking about herself and Safra Bank"), and id. at 119 (his belief that Ferreira was referring to "an investment of Safra Bank, not mine").  Plaintiff testified that he thought these were Safra purchases because of Ferreira's use of the pronoun

---

Ferreira did make an oral guarantee to Plaintiff.  First, Safra contends that such a guarantee would violate New York's statute of frauds.  Second, it asserts that such a guarantee would be unenforceable because the Investment Agreement is an integrated written contract that permits modifications in writing only.  Because the Court finds that Ferreira did not guarantee Plaintiff's principal as a matter of fact, it will not be necessary to address the merit of these legal contentions.

"our investment," although he then conceded that she repeatedly discussed "your investments." (Id. at 119 (quoting Joint Ex. 5 at 116) (emphasis added); see also Joint Ex. 4 at 611 (Ferreira talking to Plaintiff about "all these companies that comprise your portfolio" (emphasis added)).)  When asked to explain what he meant when he emailed, "Dear Camilla, How are our investments?" Plaintiff testified that he "was just trying to be polite" and was not referring to specific investments that had been purchased. (Trial Tr. at 117–18.)  And he attempted to discount Ferreira's October 6, 2008 detailed overview of his account by stating, "Look, she is saying investments made are structured notes.  She is talking in a generalized manner." (Id. at 125.)

The Court finds that Plaintiff's increasingly tortured explanations defy all credulity.  A review of the record reveals that Ferreira's emails were generally quite plain.  The Court makes this finding even after allowing for the slight gradations in meaning that may occur when documents are translated, although it notes that Plaintiff has not disputed the accuracy of any of the translated emails.  Regardless of the language, phrases such as "your portfolio," "what you have today," and "How are our investments?" are unambiguous on their face. Likewise, the conversations between Plaintiff and Ferreira are simply not susceptible to the alternative interpretations

22

Plaintiff now attempts to place on them.  They certainly cannot be reasonably read to mean that the purchases were hypothetical, "generalized," or proprietary.  This is especially so given his repeated inquiries about them. See, e.g., Joint Ex. 5 at 118; id. at 122 ("Any news about the placements?").)  Based on its review of the evidence and its observations of Plaintiff's testimony, the Court concludes that he understood that the investments were his.

## II.  Conclusions of Law

Plaintiff asserts several theories of liability, all premised on the fact that Ferreira entered into transactions using money from his account without his explicit authorization. As noted earlier, he is presently pursuing claims based on (1) securities fraud under Rule 10b-5; (2) breach of contract; (3) breach of fiduciary duty; and (4) common law fraud.  Along with alleged losses of $90,722 plus interest, he seeks punitive damages.

Safra notes that Plaintiff knew that Ferreira had entered into the three transactions that eventually lost money, but chose not to repudiate them.  Safra argues that as a consequence, Plaintiff is barred from recovering his losses. The Court agrees, and concludes that none of Plaintiff's claims can prevail.

## A.   Plaintiff Failed to Timely Object to the Transactions

### 1.   Legal Standard

A bank or brokerage may require its customers to notify it promptly and in writing of any objection to transactions appearing on the customer's statement. See, e.g., Goldberg v. Kidder Peabody & Co., Inc., 991 F. Supp. 215, 217–18 (S.D.N.Y. 1997); In re Drexel Burnham Lambert Group, Inc., 157 B.R. 539, 543 (S.D.N.Y. 1993); Catalino v. Marine Midland Bank, 756 N.Y.S.2d 770, 770–71 (2d Dep't 2003) (concluding that plaintiff waived cause of action against custodial bank "by failing to notify the Bank of the unauthorized withdrawals within 14 days after the account statements itemizing these transactions were made available to them, as required by the deposit account agreement"). Where unauthorized investments are involved, written notice clauses serve to prevent a customer from staying silent and waiting to see if he makes money on a transaction. See Modern Settings, Inc. v. Prudential-Bache Sec., Inc., 936 F.2d 640, 645–46 (2d Cir. 1991). Such clauses are also useful to courts to the extent that they keep trading disputes from devolving into "swearing contests" between the financial institution and its customer. Id.

Absent unusual circumstances, New York courts have generally enforced notice clauses.[5] <u>See, e.g.</u>, <u>Catalino</u>, 756 N.Y.S.2d at 770–71; <u>Qassemzadeh v. IBM Poughkeepsie Emps. Fed. Credit Union</u>, 561 N.Y.S.2d 795, 796 (2d Dep't 1990); <u>Retail Shoe Health Comm'n v. Mfrs. Hanover Trust Co.</u>, 558 N.Y.S.2d 949, 951 (1st Dep't 1990); <u>cf.</u> <u>Modern Settings</u>, 936 F.2d at 645–46.  A valid notice provision can act as a bar to all claims against the defendant institution, including common law fraud, securities fraud, and breach of contract. <u>See, e.g.</u>, <u>Goldberg</u>, 991 F. Supp. 215; <u>Retail Shoe</u>, 558 N.Y.S.2d at 951 (contractual notice requirements construed as "conditions precedent to any suit").  The plaintiff bears the burden of demonstrating promptness. <u>Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank</u>, 850 F. Supp. 1199, 1213–14 (S.D.N.Y. 1994).

## 2.  Analysis

By opening an account with Safra and acknowledging the IBTC, Plaintiff agreed to

---

[5] Where the unauthorized transaction is a check or wire transfer, the notice provisions of the Uniform Commercial Code apply. <u>See, e.g.</u>, <u>Elden v. Merrill Lynch</u>, No. 08 Civ. 8738, 2011 WL 1236141, at *5–6 (S.D.N.Y. Mar. 30, 2011) (checks); <u>Phil & Kathy's v. Safra Nat'l Bank of N.Y.</u>, 595 F. Supp. 2d 330, 332 (S.D.N.Y. 2009) (wire transfers). Here, neither party has argued for the application of the UCC to the structured note transactions involved in this case.  Even if the UCC would otherwise apply, the parties were free to alter its notice requirements by contractual agreement. <u>E.g.</u>, <u>Clemente Bros. Contracting Corp. v. Hafner-Milazzo</u>, 954 N.Y.S.2d 156, 158 (2d Dep't 2012) (citations omitted).

> exercise reasonable care and promptness in examining
> [his bank statements] to discover any irregularity
> . . . and to notify the Bank promptly and in writing
> of any such discovery and in no event more than 30
> calendar days subsequent to the time that such
> statement was first mailed or made available to you.
> In those situations in which you have authorized the
> Bank to hold your correspondence . . . this section
> shall apply as if you received such statement on the
> date shown on the statement.

(Joint Ex. 1 at 12.)

In the instant case, Plaintiff agreed to have his mail held by Safra. The IBTC states that the "hold mail" service does not absolve the customer of his responsibility to review his account statements. See Joint Ex. 1 at 12; cf. Regatos v. North Fork Bank, 257 F. Supp. 2d 632, 645 (S.D.N.Y. 2003) (noting, in another context, that "a 'held' account statement will start the clock running on the time to object to unauthorized checks"). Plaintiff nevertheless chose not to review his account documents, and also chose not to avail himself of online banking services. On October 6, 2008, Ferreira expressly advised Plaintiff of his diminished account balance and of the three transactions which lost money. Plaintiff received this email, but did not raise any concerns about the activity in his account until July 2009. Under these circumstances, the IBTC deems him "fully precluded" from raising any claims and states that he must bear any losses arising out of transactions that are

26

recorded in the statements. (Id.)  Similar warnings appear on
Plaintiff's monthly account statements. (Joint Ex. 3 at 141.)

   Plaintiff offers no compelling reason why he should be
excused from his agreement to the notice provisions of the IBTC.
He does not allege fraud in the inducement; indeed, he is suing
Safra on the contract's terms.  At the same time, Plaintiff
intermittently condemns the IBTC as a contract of adhesion, and
urges that those terms which are unfavorable to his position
cannot be read literally because to do so would be
unconscionable. (Pl. Proposed Conclusion of Law ¶ 38.)

   Plaintiff's position in this regard is meritless.  "Such
claims are judged by whether the party seeking to enforce the
contract has used high pressure tactics or deceptive language in
the contract and whether there is inequality of bargaining power
between the parties." Sablosky v. Edward S. Gordon Co., Inc.,
535 N.E.2d 643, 647 (N.Y. 1989).  Mere disparity in bargaining
power, by itself, does not make an otherwise valid contract
unenforceable. See Rosenfeld v. Port Auth. of N.Y. & N.J., 108
F. Supp. 2d 156, 165 (E.D.N.Y. 2000) (observing that such a
disparity exists with "the vast majority of form contracts,
including those that are enforceable").  Here, there is no
allegation that Plaintiff was pressured to open an account with
Safra, or that the IBTC is misleading.  And while Plaintiff
criticizes irrelevant portions of the IBTC as substantively

unconscionable (Pl. Proposed Conclusion of Law ¶ 38), he does not explain why it would be grossly unreasonable for Safra to bargain for timely notice of unauthorized activity in the account.

As the Second Circuit stated, Plaintiff "cannot now reject" his acknowledgement of, and agreement to, the terms of the IBTC and Special Services Agreement which authorized Safra to hold his account statements. Filho, 489 F. App'x at 485 n.2.  It nevertheless bears emphasizing that even if notice could not be imputed to Plaintiff through the account documents, he was on actual notice of the unauthorized activity after Ferreira's October 6, 2008 email.  Despite this, Plaintiff waited over nine months to object to the activity over the telephone.  He then waited roughly two more months before memorializing his objection in the September 9, 2009 email.  By any metric, then, Plaintiff failed to timely object to the losing transactions, and his agreement with Safra precludes any belated recovery.

### B.   Safra Has Successfully Proven Ratification

In addition to its contractual arguments, Safra asserts the affirmative defense of ratification.  It contends that Plaintiff ratified the three structured note transactions at issue in this litigation, and is therefore precluded from recovering the losses arising out of those transactions.  Although Plaintiff's claims fail on prompt notice grounds, the Court concludes that

his ratification of the relevant transactions is an alternative basis for a defense verdict.

### 1.    Legal Standard

Courts in this district have defined ratification as "the express or implied adoption, i.e., recognition and approval, of the unauthorized acts of another." E.g., Davis v. Carroll, 937 F. Supp. 2d 390, 426–27 (S.D.N.Y. 2013).  Where a principal has ratified a transaction entered into by his agent, he will be responsible for that transaction "whether originally authorized or not." Banque Arabe, 850 F. Supp. at 1213 (quoting Julien J. Studley, Inc. v. Gulf Oil Corp., 282 F. Supp. 748, 751–52 (S.D.N.Y. 1968) (rev'd on other grounds)).  Ratification may therefore be thought of as "a form of subsequent authorization." Julien J. Studley, 282 F. Supp. at 751.

Because ratification is an affirmative defense, the defendant carries the burden of proof. Banco de la Republica de Colombia v. Bank of New York Mellon, No. 10 Civ. 536, 2013 WL 3871419, at *8 (S.D.N.Y. July 26, 2013) (citations omitted).  It is a high burden:  "ratification requires (1) acceptance by the principal of the benefits of his agent's acts; (2) with full knowledge of the material facts; and (3) circumstances indicating an intention to affirm or adopt the otherwise-unauthorized arrangement." Davis, 937 F. Supp. 2d at 427 (citing Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland Ltd., 835 F.2d

32, 36 (2d Cir. 1987); <u>Orix Credit Alliance v. Phillups-Mahnen,</u>
<u>Inc.</u>, No. 89 Civ. 8376, 1993 WL 183766, at *4 (S.D.N.Y. May 26,
1993)).  And while the principal's intent to ratify "may be
implied from knowledge of the principal coupled with a failure
to timely repudiate," his assent to the agent's action "must be
clearly established and may not be inferred from doubtful or
equivocal acts or language." <u>Leser v. U.S. Bank Nat'l Assoc.</u>,
No. 09 Civ. 2362, 2012 WL 4472025, at *19 (E.D.N.Y. Sept. 24,
2012) (citations and internal quotation marks omitted); <u>cf.</u> <u>In</u>
<u>re Adelphia Recovery Trust</u>, 634 F.3d 678, 693-94 (2d Cir. 2011)
("Where the allegedly ratifying party's silent acquiescence to a
transaction credibly appears to have resulted from the
complexity of the situation rather than intent, ratification
does not occur.").

## 2.   Analysis

The Court concludes that Safra has met its burden of
establishing that Plaintiff ratified the transactions at issue.
The evidentiary record, combined with Plaintiff's testimony at
trial, demonstrate that the requirements of acceptance,
knowledge, and intent are all met.

First, it cannot be disputed that Plaintiff accepted the
three transactions without inquiry or objection.  As discussed
earlier, Plaintiff was on actual notice of the transactions
Ferreira initiated.  As set forth in the trial exhibits and

summarized above, Ferreira sent Plaintiff several emails
detailing various structured products and the way they worked.
Indeed, not only was Plaintiff on actual notice of Ferreira's
general course of conduct; he even knew about the very
transactions for which he now seeks to recover.  Ferreira
discussed them in her email dated October 6, 2008. (Joint Ex. 4
at 611.)  The email also discloses that Plaintiff's account
balance had dwindled to $12,760.45 by that time — a fact which
surely would have alarmed Plaintiff if he truly had no knowledge
of the investments.

    Second, the record demonstrates that Ferreira advised
Plaintiff regarding the material facts of the disputed
transactions.  As early as December 2006, she explained the
mechanics of the structured notes. (Joint Ex. 5 at 124.)  In the
months that followed, she sent him several updates about which
products she had invested his money in, and the return they
yielded. (Id. at 114–19.)  Finally, her October 6, 2008 email
set forth the details of the three transactions which were
eventually sold at a loss.  It is undisputed that Plaintiff
received and reviewed these emails.

    At trial, Plaintiff contended that Ferreira guaranteed to
him that he would not lose the principal on his investments,
such that he could not have understood these transactions.  But

as discussed in Part I.B.2 above, the Court does not credit this contention, which is at odds with the evidence in the record.

Finally, the Court concludes from Plaintiff's course of conduct during the period of Ferreira's trading that he intended to affirm her actions. Intent "may be implied from knowledge of the principal coupled with a failure to timely repudiate." Leser, 2012 WL 4472025, at *19. Plaintiff's knowledge cannot seriously be disputed, given the email record in this case and Plaintiff's testimony that he received and reviewed Ferreira's emails. See, e.g., Trial Tr. at 106-07. In response to these messages, he never raised an objection or even the specter of repudiation. Indeed, Plaintiff periodically inquired as to the status of the investments. (Joint Ex. 5 at 118; id. at 122.) His dealings with Ferreira constitute "'unequivocal conduct giving rise to a reasonable inference that he intended the conduct to amount to a ratification.'" Brown v. City of S. Burlington, Vt., 393 F.3d 337, 344 (2d Cir. 2004) (quoting 66 Am. Jur. 2d Release § 27 (2001)).

As the correspondence between Plaintiff and Ferreira illustrates, this is not a situation where "silent acquiescence to a transaction credibly appears to have resulted from the complexity of the situation rather than intent." In re Adelphia Recovery Trust, 634 F.3d at 693-94. Instead, the picture that emerged at trial was of a man who was dissatisfied with the

32

interest his account was generating, who allowed a bank employee to invest his money in products that carried risk, who enjoyed high returns on some of those investments for over a year, and who cried foul only after other investments lost money as the economy deteriorated in 2008.

Plaintiff's arguments against ratification merit little discussion.  His contention that the doctrine only applies to discretionary brokerage accounts, in which a broker is authorized to trade on the customer's behalf, is incorrect. (Summation Tr. at 26.)  Ratification is a basic agency law concept that the Second Circuit has discussed in a variety of contexts. See, e.g., Harrington v. Atlantic Sounding Co., Inc., 602 F.3d 113, 127 (2d Cir. 2010) (arbitration agreement arising out of an employment dispute); Hamm v. United States, 483 F.3d 135, 140 (2d Cir. 2007) (Government's liability for military reservist's negligent driving under the FTCA); Monarch Ins. Co. of Ohio v. Ins. Corp. of Ireland Ltd., 835 F.2d 32, 36 (2d Cir. 1987) (reinsurance contracts); Burden v. Robertson, 7 F.2d 266, 268–69 (2d Cir. 1925) (corporate governance).

Counsel for Plaintiff is similarly mistaken in arguing that a finding of ratification would be "like blaming the victim[] [b]ecause there's no duty to ratify." (Summation Tr. at 49.) Plaintiff did have a duty, both under the common law and the contracts he signed, to object to unauthorized activity.

Instead of objecting, Plaintiff repeatedly inquired after the progress of Ferreira's transactions.  On the record before the Court, there is no evidence that should have led Safra or Ferreira to conclude that Plaintiff disapproved of the investments.  Indeed, the evidence suggests the opposite.

Counsel's arguments against ratification also betray a fundamental misunderstanding of the doctrine.  He repeatedly argued at summation that it would be unfair to penalize Plaintiff for ratifying transactions that Ferreira entered into without any authority.  See, e.g., Summation Tr. at 49 ("You can't try to put a certain onus on Plaintiff. . .  Because Ms. Ferreira went off and did what she did without even telling him most of the time.")  This ignores the fact that by definition, ratification is the adoption of an agent's unauthorized or fraudulent acts. See Davis, 937 F. Supp. 2d at 426-27; Frota v. Prudential-Bache Sec., Inc., No. 85 Civ. 9698, 1987 WL 4925, at *3 (S.D.N.Y. May 15, 1987) (describing ratification as a "well-recognized defense[] to securities fraud claims"); Harold Gill Reuschlein & William A. Gregory, The Law of Agency & Partnership § 27, at 72 (2d ed. 1990) ("[Ratification] is the affirmance of an act done originally without authority.").  Thus, Ferreira's unauthorized conduct does not preclude Safra from asserting ratification.  Again, the law says the opposite:  in the agency

34

context, the doctrine applies only where an agent has exceeded her authority.

To summarize, Safra's agent Ferreira unquestionably exceeded her authority when she made investments in Plaintiff's account, including the three structured notes that ultimately lost money.  But when Plaintiff learned of these purchases, he did not repudiate them.  He stayed silent as to these three investments, and took a step further by inquiring as to the progress of others.  Accordingly, the Court concludes that Plaintiff ratified Ferreira's unauthorized activity.  He cannot now recover for the losses that flowed from that ratification.

### C.  Plaintiff's Fraud Claims

As set forth above, Plaintiff's failure to timely object to the structured note purchases, as well as his ratification of the purchases, precludes recovery from Safra on any of his causes of action.  Even if this were not the case, however, Plaintiff's claims for securities fraud and common law fraud would fail.

### 1.  Material Omission

"The elements of claims for federal securities fraud and New York common law fraud are nearly identical." E.g., Newman v. Family Mgmt. Corp., 530 F. App'x 21, 24 (2d Cir. 2013) (summary order).  But cf. Marini v. Adamo, --- F. Supp. 2d ----, 2014 WL 465036, at *16, 35 (E.D.N.Y. 2014) (noting that plaintiff must

prove each element of common law fraud by clear and convincing evidence, instead of the lower preponderance standard required to show a § 10(b) claim).  An essential element of each, as Plaintiff notes, is the existence of a material misstatement or omission. <u>See</u> <u>Newman</u>, 530 F. App'x at 24 (citing <u>Starr ex rel.</u> <u>Estate of Sampson v. Georgeson Shareholder, Inc.</u>, 412 F.3d 103, 109 (2d Cir. 2005) (federal securities fraud); <u>Eternity Global</u> <u>Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.</u>, 375 F.3d 168, 186–87 (2d Cir. 2004) (New York common law fraud)).

In this case, Plaintiff contends that the material omission was that Safra

> did not inform Plaintiff Delio Filho most of the time that Defendant bank was using his account monies were used [sic] for transactions in Structured Notes; and when disclosure was made, Defendant Bank put Plaintiff Delio's funds into high risk Structured Notes without a disclosure of the high risks associated with such Structured Notes and without the provision of the Term Sheets for Structured Notes to Plaintiff Delio Filho.

(Pl. Proposed Conclusion of Law ¶ 12.)  However, as the Court has found, Plaintiff was informed of the three losing note transactions.  He received Ferreira's October 6, 2008 email, and his hold mail account contained his monthly account statements, trade confirmations, and term sheets.  These term sheets included ample disclosure of the structured notes' risks. Plaintiff does not argue otherwise, but points to a provision in the IBTC that says, in relevant part:  "You understand that

United States law requires that certain materials in connection with securities . . . be forwarded to you regardless of any hold mail arrangement." (Joint Ex. 1 at 12.)  But he has not taken the obvious and necessary next step of showing that proposition to be true in the circumstances of this case.  Indeed, he has cited no legal support for it other than the contract's passing reference to "United States law."  This does not suffice to carry Plaintiff's burden.  Accordingly, Plaintiff has not shown a material omission by Safra.

### 2.   Scienter

Nor is the essential element of scienter, or intent, established in this case.  "[T]he requisite intent exists when it is clear that a scheme, viewed broadly, is necessarily going to injure." AUSA Life Ins. Co. v. Ernst & Young, 206 F.3d 202, 220-21 (2d Cir. 2000) (internal quotation marks and alteration omitted).  A plaintiff may present his case circumstantially, In re WorldCom, Inc. Sec. Litig., 352 F. Supp. 2d 472, 495-96 (S.D.N.Y. 2005), but ultimately must raise a strong inference of scienter that is "more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 314 (2007).  This can be done by showing either (1) motive and opportunity to commit the fraud, or (2) strong circumstantial evidence of conscious

37

misbehavior or recklessness. ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009).  "Motive and opportunity require plausible allegations of concrete benefits that could be realized by the misstatement, and the likely prospect of achieving such benefits." Delshah Grp. LLC v. Javeri, No. 09 Civ. 6909, 2013 WL 2322488, at *18 (S.D.N.Y. May 28, 2013) (citing Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994)). Recklessness in this context refers to "a state of mind approximating actual intent, and not merely a heightened form of negligence." Novak v. Kasaks, 216 F.3d 300, 312 (2d Cir. 2000) (citation and internal quotation marks omitted); see also In re Carter-Wallace, Inc. Sec. Litig., 220 F.3d 36, 39–40 (2d Cir. 2000) (conscious misbehavior theory requires showing "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it").

Here, Plaintiff has utterly failed to demonstrate scienter, even circumstantially.  He urges in a parenthetical that Safra possessed the motive and opportunity to defraud him because "the status of Plaintiff Delio Filho's account in late 2006 was considered unsatisfactory." (Pl. Proposed Conclusion of Law ¶ 15; accord Pl. Pretrial Br. at 27.)  This is a confusing

proposition, both syntactically and substantively.  If Plaintiff means that Safra was motivated to defraud him because he had grown dissatisfied with his account performance (Trial Tr. at 93-94), the Court is unconvinced.  To demonstrate motive, the caselaw requires the showing of a "concrete and personal" benefit to Safra or its agents.  Novak, 216 F.3d at 307-08.  Although Ferreira plainly exceeded her authority when she purchased structured notes with Plaintiff's account monies, there is no evidence that she intended for herself or for Safra to directly gain from those transactions.  Plaintiff alternatively urges that "the conclusion of 'conscious recklessness' jumps out from the record." (Pl. Proposed Conclusion of Law ¶ 15.)  The Court again disagrees. Plaintiff's argument, such as it is, is precisely the mere "heightened form of negligence" theory rejected by the Second Circuit.  Novak, 216 F.3d at 312.

Summarily, although Ferreira and Safra are not without fault in this matter, none of Plaintiff's assertions of scienter are sufficiently strong to be "at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314.  Accordingly, Plaintiff's fraud claims fail.

## III.   Conclusion

For the foregoing reasons, the Court finds Defendant not liable on all causes of action alleged in the complaint. Judgment is entered for Defendant and the Clerk of Court is respectfully directed to close the case.

**SO ORDERED.**

Dated:      New York, New York
            March // , 2014

John F. Keenan
United States District Judge

40